2001 SD 109

**STATE of South Dakota, Plaintiff and Appellant,**

**v.**

**Vincent MYHRE, Defendant and Appellee.**

**No. 21515.**

Supreme Court of South Dakota.

Considered on Briefs Nov. 27, 2000.

Reassigned June 29, 2001.

Decided Aug. 22, 2001.

Glenn A. Brenner, Pennington County States Attorney.

Matthew M. Brown, Deputy States Attorney Rapid City, SD, Attorneys for plaintiff and appellant.

Kenneth R. Dewell of Viken, Viken, Pechota, Leach & Dewell, Rapid City, SD, Attorneys for defendant and appellee.

SABERS, Justice (on reassignment).

[¶ 1.] Magistrate Judge Shawn Pahlke granted Myhre's motion to suppress his second statement, the evidence seized and quashed the arrest. This Court granted the State's petition for intermediate appeal. We affirm.

## FACTS

[¶ 2.] Bruce Nachtigall is an assistant regional supervisor for law enforcement for the South Dakota Department of Game, Fish & Parks. At 4:30 p.m. on November 20, 1999, he was on patrol checking deer hunters north of Wall, South Dakota, when he observed a Suburban parked 50 yards off the road. Three people were outside of the vehicle; one was gutting a deer.

[¶ 3.] The three individuals were Darrell Kurth, Myhre, and his son, Todd. Todd was the only person with a deer tag left. Darrell, who was "really nervous" and shaking, retrieved it from the glove compartment. Nachtigall visited with the trio about the hunt. He did not believe their description of the hunt was accurate due to the location of the vehicle in relation to the deer and Darrell's nervousness. He had no more questions, however, and left to drive down the road to see if there were rifle casings or skid marks which would indicate the shooting of the deer from the road. He saw neither.

[¶ 4.] Nachtigall then came upon another group of hunters a half mile away and stopped to visit with them. They described seeing a northbound Suburban following a deer. Both disappeared from their sight and then they heard a gunshot. Nachtigall decided to go back and interview the Myhre party since "this sounded different from the story they told me."

[¶ 5.] When Nachtigall returned, he saw the Myhre party driving toward the approach to the road. He pulled parallel to the vehicle and told Todd, who was in the front passenger seat, that he needed to visit with him. He then pulled in behind the Suburban.

[¶ 6.] When Todd was seated in Nachtigall's vehicle, Nachtigall told him that the other group of hunters told a totally different story than the Myhre group. He asked for Todd's version. Todd told him that his father and Darrell shot the deer because it was on their side of the road.

Nachtigall directed Todd to remain on the tailgate of his pickup and had Darrell get in the pickup. After questioning, Darrell confirmed Todd's story. He was told to remain in the pickup.

[¶ 7.] Nachtigall returned to the Suburban and spoke with Myhre who was seated in the back seat behind the driver's seat. He asked for his version of the story and was told "[w]hatever the other two said." They "bantered" back and forth for a "little bit" as Myhre kept insisting "whatever the boys said." Nachtigall told him "what I thought happened, and that I think you guys were coming down the road and the deer crossed the road and you and Darrell shot the deer and Todd didn't shoot the deer." Myhre then admitted that Darrell shot once and he shot twice before killing the deer. Nachtigall did not administer *Miranda* warnings to Myhre prior to this questioning.

[¶ 8.] Myhre was cited for hunting big game without a license. SDCL 41–8–6. Nachtigall then seized all of the rifles and the tagged deer carcass.

## STANDARD OF REVIEW

[¶ 9.] A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo. *State v. Stanga*, 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488. *See also Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996) (standard of review for questions under the Fourth Amendment); *United States v. Khan*, 993 F.2d 1368, 1375 (9th Cir.1993). We review findings of fact under the clearly erroneous standard. *State v. Almond*, 511 N.W.2d 572, 573–74 (S.D.1994). Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo. *Spenner v. City*

*of Sioux Falls*, 1998 SD 56, ¶ 13, 580 N.W.2d 606, 610.

[¶ 10.] **1. WHETHER THE STATE FAILED TO PRESERVE THE ISSUE FOR APPEAL.**

[¶ 11.] At the hearing on the motion to suppress, both sides argued the application of *Miranda* to the facts of this case. The trial court ruled from the bench:

> At this time, I would like to address the *Miranda* issue first. Clearly, by the testimony given today, the Defendant in this matter, Mr. Myhre, was the subject of the investigation. It's, also, clear that he had indicated that what he had to say was what the other two individuals said, and that's all he had to say and he was clearly the person who the officer was questioning at that time. He was not free to leave and, therefore, in this Court's opinion, he should have been read *Miranda* at that point. I do find that it was a *Miranda* violation regarding advisement at that point, and any statements attributable to the Defendant after that point would not be allowed.

The court entered written findings of fact and conclusions of law on Myhre's motion to suppress. While it is true that the State did not object to the proposed findings on the motion to suppress, this does not constitute a waiver under South Dakota law.

[¶ 12.] Motions to suppress evidence must be raised prior to trial. SDCL 23A–8–3. Pursuant to SDCL 23A–8–8, "[w]here factual issues are involved in determining a motion [to suppress] the court shall state its essential findings on the record." While this Court prefers that a trial court enter written formal and specific findings and conclusions when it rules on a suppression motion, it has recognized

that verbal findings and conclusions made on the record are acceptable. *State v. Holiday*, 335 N.W.2d 332 (S.D.1983). The *Holiday* court held:

> In harmonizing [*State v.* ]*Stumes, supra,*[ 90 S.D. 382, 241 N.W.2d 587 (1976)] and its progeny with SDCL 23A–8–3 and –8, we determine that a trial court judge may verbally enter on the record at the motion hearing the findings of fact and conclusions of law upon which it bases its opinion. In the interest of clarity and to preserve the record for appeal, it may direct prevailing counsel to prepare formal written findings and conclusions. When these are signed and filed they meet the requirement of SDCL 23A–8–8 that the trial court's findings be stated on the record. Furthermore, the exercise of entering such written findings and conclusions will most likely insure against speculation or conjecture as to the basis upon which the trial court grounded its decision. *We hold, however, that such written findings and conclusions are not within the contemplation of SDCL 15–6–52(a). Opposing counsel is not required nor even afforded the opportunity to present alternatives or objections, yet, as in the case of findings verbalized on the record, his issues are preserved for appeal.*

*Holiday*, 335 N.W.2d at 338 (emphasis added).

[¶ 13.] **2. WHETHER THE TRIAL COURT ERRED IN GRANTING MYHRE'S MOTION TO SUPPRESS.**

[¶ 14.] In this case, the trial court concluded that Nachtigall had a constitutional obligation to advise Myhre of his *Miranda* rights prior to the commencement of the second interrogation because he was the primary focus of the officer's investigation and in custody.

■■■ [¶ 15.] *Miranda* warnings must be given whenever a defendant is interrogated while in police custody. *State v. Thompson*, 1997 SD 15, 560 N.W.2d 535.

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of the law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*Id.* at ¶ 23, 560 N.W.2d at 540. "*Miranda* imposes 'concrete constitutional guidelines for law enforcement agencies and courts to follow." *State v. Stanga*, 2000 SD 129, ¶ 13, 617 N.W.2d 486, 489 (quoting *Miranda v. Arizona*, 384 U.S. 436, 442, 86 S.Ct. 1602, 1611, 16 L.Ed.2d 694, 705 (1966)). The basic tenet of *Miranda* rights is that a suspect is entitled to be told that "anything he says can be used against him in a court of law." *Id.* This constitutional protection is required whenever a suspect is the subject of "custodial interrogation." *State v. Morato*, 2000 SD 149, ¶ 17, 619 N.W.2d 655, 661. The lynchpin in this case is whether Myhre was in custody, and, under the precedent of this Court, he was.

[¶ 16.] In *State v. Morato*, we determined that Morato was not in custody and therefore *Miranda* warnings were not required. *Id.* ¶ 20. The circumstances surrounding that questioning supported that determination. Morato was placed in a patrol car but was informed that he was

"free to leave" and he was "not under arrest." *Id.* ¶ 19. The officer's tone was conversational and the suspect spoke freely. *Id.* Given the tone of this encounter, we concluded, "the objective conditions surrounding the interview remained noncustodial." *Id.* ¶ 20.

[¶ 17.] In *State v. Anderson*, we recognized that Anderson's voluntary acceptance of an invitation to the police station and his choosing to speak with the police while not restrained in any way did not constitute custodial interrogation. 2000 SD 45, ¶ 77, 608 N.W.2d 644, 666. During questioning, Anderson was reassured he was "free to leave at any time." *Id.* The setting in *Anderson* never became coercive and at the end of the interview he was allowed to leave and return home. *Id.*

[¶ 18.] In *State v. Herting*, we held that "subjective thoughts are not a proper basis for the determination of whether [the suspect] was in custody." 2000 SD 12, ¶ 13, 604 N.W.2d 863, 866. We reiterated that "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* Under the circumstances in *Herting*, a united Court determined that the Officer's lone question of "what happened tonight" was not enough to trigger the *Miranda* protections. *Id.* ¶ 12.

[¶ 19.] Likewise, in *State v. Gesinger*, we held that an officer's testimony at the suppression hearing that the suspect "was not free to leave" was not determinative. 1997 SD 6, ¶ 18, 559 N.W.2d 549, 552. However, it is relevant in determining how the reasonable person would have perceived the officer's actions. *Id.* Clearly, an officer's perception that a suspect is not free to leave could reflect in his actions. Therefore, we must turn to the facts of this case and review them independently to determine whether Myhre was in custody. *See Morato*, 2000 SD 149, ¶ 17,

619 N.W.2d at 661 (stating that "[w]e independently review whether a suspect was in custody, entitled to *Miranda* warnings.").

[¶ 20.] A review of the facts surrounding Myhre's encounter with Nachtigall reveals he was in custody for *Miranda* purposes. Nachtigall had visited with the group of hunters not once but twice. He returned and separated the three men and conducted interviews. After these interviews, he approached Myhre who had been ordered to remain in the vehicle. Armed with statements from the other two implicating Myhre, Nachtigall proceeded with his interview. He never informed Myhre that he was free to leave nor that Myhre did not have to talk to him. Myhre repeatedly attempted to avoid questioning by deferring to whatever the others had said. Nachtigall clearly told him that he believed Myhre illegally shot the deer and repeatedly questioned him to that extent. This questioning went beyond general on the scene questioning and fact gathering but was instead intended to elicit an incriminating response.

[¶ 21.] It is clear that the tone of the questioning was not conversational, Nachtigall testified that Myhre "couldn't leave," and that Myhre did not speak freely or voluntarily. These circumstances would lead a reasonable person to believe that he was in custody. Fortunately, we are dealing with the shooting of a deer, not a person. Yet, the constitutional safeguards are absolutely identical. Envision a shooting suspect ordered to remain in his vehicle. The officer questions his companions and he is the prime suspect. The suspect refuses to answer questions but the officer persists and accuses him of the shooting. The officer acknowledges he is not free to leave and the questioning is intended to elicit an incriminating response. *Miranda* warnings are required.

[¶ 22.] We affirm.

[¶ 23.] AMUNDSON and KONENKAMP, Justices, concur.

[¶ 24.] MILLER, Chief Justice, and GILBERTSON, Justice dissent.

MILLER, Justice (dissenting).

[¶ 25.] The majority misapprehends the relevant inquiry and South Dakota's settled law in Issue Two leading it to wrongly conclude that Myhre's statements should be suppressed. I respectfully dissent.

[¶ 26.] The standard for review of a trial court's ruling on a motion to suppress is:

A trial court's findings of fact from a suppression hearing must be upheld unless they are clearly erroneous.... This court's function under the clearly erroneous standard is to determine whether the decision of the lower court lacks the support of substantial evidence, evolves from an erroneous view of the applicable law or whether, considering the entire record, we are left with a definite and firm conviction that a mistake has been made. In making this determination, we review the evidence in a light most favorable to the trial court's decision.

*State v. Meyer*, 1998 SD 122, ¶ 16, 587 N.W.2d 719, 722–23 (citations omitted).

[¶ 27.] In this case the trial court concluded that Nachtigall had a constitutional obligation to advise Myhre of *Miranda* prior to the commencement of the second interrogation because he was the primary suspect and the focus of the officer's investigation. The trial court's reliance on this one factor is contrary to settled South Dakota law and the majority's affirmance of the trial court's ruling only serves to further the misapplication of South Dakota law to the undisputed facts of this case.

[¶ 28.] *Miranda* warnings must be given whenever a defendant is interrogated while in police custody. *State v. Thomp-son*, 1997 SD 15, ¶ 23, 560 N.W.2d 535, 540.

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of the law enforcement system which may ultimately cause the suspect to be charged with a crime. *But* police officers *are not required* to administer *Miranda* warnings to everyone whom they question. *Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'*

*Id.* (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977) (emphasis added).

[¶ 29.] In *State v. Herting*, this Court elaborated:

The test in determining whether *Miranda* warnings are required 'is not whether the investigation has focused on any particular suspect, but rather, whether the person being questioned is in custody or deprived of his or her freedom to leave.' The United States Supreme Court recently expanded on the *Mathiason* standard, holding 'the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' Further, this Court has stated:

An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned. Those beliefs are relevant only to the extent they would affect how a reasonable

person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.' *Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.* The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case. In sum, *an officer's views concerning the nature of an interrogation, or beliefs concerning the potential culpability of the individual being questioned, may be one among many factors that bear upon the assessment whether that individual was in custody, but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave.*

2000 SD 12, ¶ 9, 604 N.W.2d 863, 865 (citations omitted) (emphasis added).

[¶ 30.] Our review of the objective circumstances surrounding Nachtigall's interrogation of Vincent reveals that Vincent was not deprived of his freedom to leave, and he was not "in custody" for purposes of *Miranda.*

[¶ 31.] As a conservation officer, Nachtigall has a duty to enforce every state statute dealing with game, fish, parks, forestry, or boating. SDCL 41–15–10.1. On the day of this incident, he was patrolling alone in a remote, rural area. He returned to the Myhre party a second time after hearing a different story from another group of hunters.

[¶ 32.] When Nachtigall questioned Vincent the second time he was attempting to gather facts about the shooting of the deer since accounts differed. Vincent was allowed to remain where he was seated in the Suburban during questioning. Nachtigall took no verbal or physical action to restrain Vincent's movement. Contrary to the majority's assertion, the facts and circumstances in this case indicate Vincent was free to leave if he chose. Vincent did not choose to leave, but, rather, he stayed and answered Nachtigall's questions. Nachtigall's questioning of Vincent constituted general on-the-scene questioning and fact gathering, "absolutely essential for law enforcement officers to perform their jobs well and to investigate possible crimes." *Herting*, 2000 SD 12, ¶ 10, 604 N.W.2d at 865 (citation omitted). As this Court has previously noted:

When circumstances demand immediate investigation by the police, the most useful, the most available tool for such investigation is general on-the-scene questioning, designed to bring out the person's explanation or lack of explanation of the circumstances which aroused the suspicion of the police, and enable the police to quickly determine whether they should allow the suspect to go about his business or hold him to answer charges.

*Id.* (citation omitted).

[¶ 33.] Vincent was not subjected to a custodial interrogation under the circumstances presented. For the foregoing reasons, I dissent from the majority's holding in Issue Two.

[¶ 34.] GILBERTSON, Justice, joins this dissent.