2002 SD 109

**STATE of South Dakota, Plaintiff
and Appellee,**

v.

**Darrell HOADLEY, Defendant
and Appellant.**

No. 22000.

Supreme Court of South Dakota.

Argued May 28, 2002.

Decided Aug. 21, 2002.

Mark Barnett, Attorney General, Craig M. Eichstadt, Deputy Attorney General,

Pierre, South Dakota, Attorneys for plaintiff and appellee.

Joseph M. Kosel, Northern Hills Public Defender's Office, Deadwood, South Dakota, Attorney for defendant and appellant.

[¶ 1.] **Justice RICHARD W. SABERS delivers the majority opinion of the Court on Issues 1, 2, 3, 4, and the writing on Issue 5, which controls the result.**

[¶ 2.] **Justice John K. Konenkamp delivers the writing on Issue 5, which controls the rationale.**

[¶ 3.] On March 12–13, 2000, Darrell Hoadley and two others, Elijah Page and Briley Piper, kidnapped and killed Chester Allan Poage in Spearfish, South Dakota. Hoadley was tried by jury and convicted of first degree murder, kidnapping, first degree robbery, first degree burglary and grand theft. He was sentenced to life in prison without parole for the first degree murder and kidnapping convictions, twenty-five years for first degree robbery and first degree burglary and ten years for grand theft, all terms to run consecutively. Hoadley appeals. We affirm.

### FACTS

[¶ 4.] On March 12, 2000, Hoadley, Piper, and Page met with Poage at his house.[1] Piper asked Poage to show him some of the guns Poage's mother owned. Poage only knew the location of one antique .22 caliber pistol. Piper then suggested killing Poage and stealing his property. Piper, Page and Hoadley convinced Poage to leave Poage's house, and the four left in Poage's Chevy Blazer, traveling to Page's house.[2]

[¶ 5.] Once there, Page exposed the .22 pistol, which he had stolen from Poage's mother's room at the Poage residence, and ordered Poage to get on the floor. Once Poage was on the floor, Piper, kicked him in the face, knocking him unconscious. While Poage was unconscious, the three tied him up and sat him upright in a chair. After he came to, Piper laid a tire iron across his feet to prevent him from moving, while Page made him drink a mixture containing crushed pills, beer and hydrochloric acid. Poage repeatedly asked them why they were doing this. In response, Piper hit him in the face and told him to shut up. The three discussed their plan to kill Poage, and Poage pleaded for his life and offered to give them everything he owned in exchange for his release. Page asked Poage for the PIN number for his ATM card, and Poage complied.

[¶ 6.] The group took Poage to his own Blazer, placed him in the back seat and threatened his life if he attempted to escape. Piper drove the group to Higgin's Gulch in Lawrence County, a remote, wooded area about seven miles from Page's house. They arrived between 11:30 pm and midnight. Poage was forced out of the Blazer into twelve-inch deep snow and instructed to remove his clothes, except his t-shirt, shoes and socks. The three then took Poage's wallet.

[¶ 7.] Hoadley, Piper and Page tried holding Poage down and covering him with snow. Poage attempted to escape, but the three recaptured him and continued to beat him. Poage was taken to the creek,

---

1. Poage lived with his mother and sister, who were on vacation in Florida at this time.

2. Testimony varies as to the origin of the plot to kill Poage and steal his property. It is unclear whether all three of the assailants planned on stealing items in the house so they could buy LSD, or whether Piper pulled Page outside to inform him he was going to steal stereo equipment from Poage's vehicle. It is also unclear whether they initially planned to kill Poage, or just beat him.

approximately fifty feet from the road. All three were involved in the beating. Hoadley admitted that he stabbed Poage at least once and held a light for Page while Page kicked Poage in the head.

[¶ 8.] During the beating, Poage asked to be allowed into the Blazer to warm up. Testimony at the sentencing hearing indicated that Poage said he preferred to bleed to death in warmth, rather than freeze to death. The group agreed to grant his request, so long as he washed the blood off of his body in the creek. After rinsing in the icy waters, the group refused to let him warm himself in the vehicle. Instead, they continued beating him and dragged him back into the creek where they attempted to drown him. Despite the drowning attempts, stabbings, beatings and stoning, Poage was still alive. Piper claims Hoadley threw the final rocks that killed Poage. Several hours after the beatings began at Higgin's Gulch, Poage was left for dead in the creek, around 3–4 a.m.

[¶ 9.] Hoadley, Piper and Page discussed the division of Poage's property, returned to his house and stole numerous items. The group then drove to Hannibal, Missouri, where they visited Piper's sister, but upon her refusal to let them stay, returned to Rapid City, South Dakota. They used Poage's ATM card for cash and pawned some of Poage's property.[3] Eventually, each went his own way.

[¶ 10.] On April 22, 2000, a body was discovered near Higgin's Gulch in Lawrence County. On April 24, 2000, Dr. Donald Habbe, a forensic pathologist from the Clinical Laboratory in Rapid City, performed an autopsy and identified the remains as Poage. Habbe discovered numerous head injuries and stab wounds. Habbe determined the cause of death was the "stab wounds and the blunt force injury to the head."

[¶ 11.] On April 25, 2000,[4] Danny Burkhart, a friend of Hoadley, told law enforcement that Hoadley was involved in the death of the person whose body was discovered in Higgin's Gulch. Law enforcement outfitted Burkhart with a recording device and asked him to speak with Hoadley.[5] During their conversation, Hoadley made several admissions about Poage's killing. Hoadley was then contacted by a DCI agent and taken to the Lawrence County sheriff's office. He was advised of his Miranda rights and agreed to waive them. He indicated that he, Piper and Page killed Poage. He agreed to accompany the officers to Higgin's Gulch where he answered questions about the murder.

[¶ 12.] On April 26, 2000, Hoadley was again interviewed by law enforcement. He was advised of his rights and agreed to waive them and speak with the officers.

[¶ 13.] An amended indictment was filed September 7, 2000, charging Hoadley

---

3. Records from Poage's bank show the ATM card was used six times in various locations in South Dakota and Nebraska. Some of Poage's property was later found at pawnshops in Wyoming and Missouri

4. On the same day, an arrest warrant was issued for Hoadley on a charge unrelated to Poage's murder. Prior to the murder, on March 6, 2000, law enforcement executed a search warrant at Page's home in Spearfish. As a result of the search and subsequent interviews, law enforcement determined that

Hoadley, Piper and another were involved in a conspiracy to distribute LSD.

5. Burkhart informed law enforcement that Hoadley could be contacted at the Deadwood Gulch Hotel, where he was laying carpet. After he had been equipped with a recording device and transmitter, Burkhart located Hoadley at the hotel and engaged him in conversation. Hoadley made several incriminating statements which law enforcement overheard.

with: (1) First Degree Premeditated Design (SDCL 22–16–4), or in the alternative, First Degree Murder, Felony Murder while engaged in kidnapping (SDCL 22–16–4), or in the alternative, First Degree Murder, Felony Murder while engaged in robbery (SDCL 22–16–4); (2) Kidnapping, Gross Permanent Physical Injury (SDCL 22–19–1), or in the alternative, Kidnapping (SDCL 22–19–1) (Class 1 Felony); (3) First Degree Robbery (SDCL 22–30–1); (4) First Degree Burglary (SDCL 22–32–1(3)); and (5) Grand Theft (SDCL 22–30A–1 and 22–30A–17(1)).

[¶ 14.] Hoadley was tried by jury in Rapid City, South Dakota, from May 2 through May 30, 2001. He was convicted of first degree murder, kidnapping, first degree robbery, first degree burglary and grand theft. Although he was facing a death sentence, he was sentenced by the jury to life in prison without parole for the first degree murder conviction. He was sentenced by the court to life in prison without parole for the kidnapping conviction, twenty-five years for first degree robbery and first degree burglary, and ten years for grand theft, all terms to run consecutively.

## STANDARD OF REVIEW

[¶ 15.] "A motion to suppress based on an alleged violation of a constitutionally protected right is a question of law reviewed de novo." *State v. Myhre,* 2001 SD 109, ¶ 9, 633 N.W.2d 186, 188 (citing *State v. Stanga,* 2000 SD 129, ¶ 8, 617 N.W.2d 486, 488). *See also Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996) (stating standard of review for questions under the Fourth Amendment).

[¶ 16.] Whether a new trial should be granted is left to the sound judicial discretion of the trial court, and this Court will not disturb the trial court's decision absent a clear showing of abuse of discretion. *State v. Perovich,* 2001 SD 96, ¶ 11, 632 N.W.2d 12, 15–16 (citing *Tunender v. Minnaert,* 1997 SD 62, ¶ 9, 563 N.W.2d 849, 851) (citation omitted).

[¶ 17.] "[E]videntiary rulings made by the trial court are presumed correct and are reviewed under an abuse of discretion standard." *Id.* (citing *State v. Goodroad,* 1997 SD 46, ¶ 9, 563 N.W.2d 126, 129). Any error "must also be shown to be prejudicial error." *Id.* (quoting *State ex rel Dept. of Transp. v. Spiry,* 1996 SD 14, ¶ 11, 543 N.W.2d 260, 263) (citation omitted). "The test is not whether we would have made the same ruling, but whether we believe a judicial mind, in view of the law and the circumstances, could have reasonably reached the same conclusion." *Goodroad,* 1997 SD 46 at ¶ 9, 563 N.W.2d at 129 (citing *State v. Rufener,* 392 N.W.2d 424, 426 (S.D.1986)).

[¶ 18.] **1. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE TAPE RECORDED CONVERSATION BETWEEN HOADLEY AND DANNY BURKHART.**

[¶ 19.] Hoadley argues that the trial court's denial of the motion to suppress the tape violated his Fourth, Fifth, Sixth and Fourteenth Amendment rights under the United States Constitution and the comparable provisions of the South Dakota Constitution.[6] He argues that the police violated his Fourth Amendment rights when they asked Burkhart to wear a wire and engage Hoadley in conversation. He claims that his Fifth Amendment rights

---

**6.** For the purpose of brevity only the provisions of the federal constitution will be referred to throughout.

against self-incrimination were violated because Burkhart was acting as a state agent when he agreed to tape record the conversation, thereby creating a custodial interrogation requiring the administration of Miranda warnings. He contends that his Sixth Amendment right to counsel was violated because he was not advised of his right to counsel prior to his conversation with Burkhart.

■ [¶ 20.] Hoadley argues that his Fourth Amendment right to be free from unreasonable searches and seizures was violated. In order to invoke the protections of the Fourth Amendment, one must demonstrate "a reasonable expectation of privacy that society should be prepared to observe[.]" *State v. Vogel*, 428 N.W.2d 272, 276–77 (S.D.1988) (citing *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

■ [¶ 21.] Hoadley had no justifiable expectation of privacy in his conversation with Burkhart. "There is an established difference between an expectation that some unknown, uninvited third person will eavesdrop and the risk that even a trusted friend will repeat or allow others to hear what you have said." *State v. Woods*, 361 N.W.2d 620, 621 (S.D.1985). *See also Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (holding that there is no justified expectation of privacy when a person with whom the defendant converses reveals that conversation to the police). "In the latter situation, a defendant assumes the risk of disclosure, as there exists no justified expectation of privacy." *Woods*, 361 N.W.2d at 621. This Court has stated that "when one person consents, there is no justified expectation that the communication will not be intercepted." *Id.* *See also United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (holding that the Fourth Amendment does not protect a noncustodial conversation between a defendant and an individual acting as a law enforcement agent).

[¶ 22.] Hoadley does not claim he was compelled to talk with Burkhart. He freely divulged details of Poage's murder. *See State v. Hamm*, 89 S.D. 507, 512, 234 N.W.2d 60, 63 (1975) (noting that defendant was neither compelled to allow acquaintance acting as a government agent into her home nor speak to him). *See also Lopez v. United States*, 373 U.S. 427, 465, 83 S.Ct. 1381, 1402, 10 L.Ed.2d 462, 486 (1963) (holding that "[t]he risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society"). Accordingly, Hoadley did not have a justifiable expectation of privacy in this conversation and he has not shown a violation of his Fourth Amendment rights.

[¶ 23.] Hoadley also argues that his Fifth Amendment rights were violated. The Fifth Amendment of the United States Constitution provides in relevant part that "[n]o person shall be compelled, in any criminal case, to be a witness against himself[.]" Hoadley argues that his conversation with Burkhart was a violation of his right against self-incrimination and that Miranda warnings should have been given.

■ [¶ 24.] Fifth Amendment rights are implicated when an individual is subjected to a custodial interrogation. *State v. Anderson*, 2000 SD 45, ¶ 74, 608 N.W.2d 644, 665 (citing *State v. Rhines*, 1996 SD 55, ¶ 11, 548 N.W.2d 415, 426) (citation omitted). Miranda warnings are required when an individual is being interrogated "in custody at the station or otherwise deprived of his freedom of action in any significant way." *Hamm*, 89 S.D. 507 at 514, 234 N.W.2d at 64 (quoting *Miranda*

*v. Arizona,* 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694, 725 (1966)). *See also Myhre,* 2001 SD 109 at ¶ 15, 633 N.W.2d at 189 (stating that Miranda warnings must be given "whenever a suspect is the subject of 'custodial interrogation' "). Whether an individual is in custody is determined by "how a reasonable man in the suspect's position would have understood his situation." *Anderson,* 2000 SD 45 at ¶ 79, 608 N.W.2d at 666 (quoting *State v. Herting,* 2000 SD 12, ¶ 13, 604 N.W.2d 863, 866). "We examine all of the circumstances surrounding the interview and 'whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *State v. Morato,* 2000 SD 149, ¶¶ 17–18, 619 N.W.2d 655, 660–61 (quoting *State v. Gesinger,* 1997 SD 6, ¶ 17, 559 N.W.2d 549, 551–52) (additional citations and internal quotes omitted). *See also State v. Darby,* 1996 SD 127, ¶ 25, 556 N.W.2d 311, 319 (stating that the test for custodial interrogation is whether the interrogators deprived the suspect of the freedom to leave) (internal quotations and citations omitted).

[¶ 25.] Hoadley was not in custody at the time of his conversation with Burkhart.[7] He was not even aware that a warrant had been issued for his arrest on an unrelated charge. He was not being questioned by law enforcement officers and had no reason to believe that Burkhart was working with law enforcement. Even though the officers were aware that a warrant for Hoadley's arrest on an LSD charge was issued, there is no showing that they purposely or knowingly delayed

arresting him for purposes of denying him his constitutional rights and interrogating him on other charges. His statements were made voluntarily and he was free to leave at any time. There is no evidence that Hoadley was compelled or coerced into speaking with Burkhart. A reasonable man in his position would have had no reason to believe that his rights were restricted in any way. This was an uncoerced noncustodial conversation. *See Hamm,* 89 S.D. at 514–15, 234 N.W.2d at 64. He has failed to show that his Fifth Amendment right against self-incrimination was violated.

[¶ 26.] He contends that his Fifth and Sixth Amendment rights to counsel were violated because he was not advised of his right to counsel prior to his conversation with Burkhart. The purpose of the Fifth Amendment right to counsel is to protect individuals from self-incrimination and assist in the custodial interrogation process. *Anderson,* 2000 SD 45 at ¶ 74, 608 N.W.2d at 665 (citations omitted). A person is not entitled to counsel if the interrogation is noncustodial. *Id.* The Sixth Amendment provides for the right of counsel in criminal prosecution. The right to counsel attaches only after judicial proceedings begin. *See Hamm,* 89 S.D. at 515–16, 234 N.W.2d at 65 (citing *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). *See also Wayne R. LaFavre, Search and Seizure,* § 8.2(k) at 693 (3rd ed. 1995). It only attaches to charged offenses and does not attach to uncharged crimes or factually unrelated

---

7. The trial court determined:

> [Hoadley] was not in custody at the construction site. .... At all times, Hoadley was free to leave the building and free to end the conversation at any time. He was in no way in custody or deprived of his freedom of movement. Miranda Warnings were not required because Defendant was

> not in custody. Defendant's statements to Burkhart were voluntary beyond a reasonable doubt. Defendant's Fourth Amendment rights were not violated as Hoadley cannot claim the construction site as a 'constitutionally protected area ... [in which he is] protected from unwarranted governmental intrusion.'

charged crimes. *Texas v. Cobb,* 532 U.S. 162, 171–72, 121 S.Ct. 1335, 1342–43, 149 L.Ed.2d 321, 331–32 (2001) (holding that "to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities") (citation omitted).

[¶ 27.] As stated, Hoadley's conversation with Burkhart was noncustodial and he had no right to an attorney under the Fifth Amendment. Additionally, Hoadley had no right to counsel under the Sixth Amendment. All of the acts complained of occurred prior to the initiation of any judicial proceedings. Hoadley failed to establish a violation of either his Fifth or Sixth Amendment right to counsel.

[¶ 28.] Hoadley also argues that his Fifth and Fourteenth Amendment due process rights were violated when the State recorded his conversation with Burkhart. As already established, the statements he made during the conversation were neither coerced nor involuntary and their admission cannot be deemed violative of his Fifth and Fourteenth Amendment rights to due process.

[¶ 29.] Hoadley has failed to establish any violations of his Fourth, Fifth, Sixth and Fourteenth Amendment rights.

[¶ 30.] **2. WHETHER THE TRIAL JUDGE ERRED IN NOT RECUSING HIMSELF FROM HOADLEY'S TRIAL.**

[¶ 31.] Hoadley argues that the trial court judge committed an abuse of discretion when he did not remove himself from the case. Hoadley claims the trial judge sentenced his two co-defendants, Piper and Page, to death and was unable to be fair and impartial during his trial. The State argues that because Piper and Page pled guilty, the trial judge was not the factfinder.

[¶ 32.] This Court has stated "[t]he opportunity to disqualify a judge is statutory, ... and not a constitutional right, except as it may be implicit in a right to a fair trial." *Goodroad,* 1997 SD 46 at ¶ 25, 563 N.W.2d at 132 (citing *Scott v. Class,* 532 N.W.2d 399, 404 (S.D.1995)) (additional citations omitted). "The decision to preside over a case lies within the sound discretion of the trial judge." *Id.* (citing *Hickmann v. Ray,* 519 N.W.2d 79, 80 (S.D.1994)). The Code of Judicial Conduct further provides that:

> A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party . . . .

Canon 3E.(1). A "judge is presumed to be impartial, and the party seeking disqualification bears the substantial burden of proving otherwise." *United States v. Walker,* 920 F.2d 513, 517 (8thCir.1990) (citing *Ouachita Nat'l Bank v. Tosco Corp.,* 686 F.2d 1291, 1300 (8th Cir.1982)).

[¶ 33.] The Eighth Circuit has stated:

> With respect to [defendant's] claim of judicial bias, the Supreme Court has made clear that "*opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion* unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."

*Von Kahl v. United States,* 242 F.3d 783, 793 (8th Cir.2001) (quoting *Liteky v. Unit-*

*ed States,* 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)) (emphasis added). Prejudice has been defined as:

> [T]he attitude of personal enmity towards the party or in favor of the adverse party to the other party's detriment. It is not the mere possession of views regarding the law or the conduct of a party. Prejudice is in the personal sense rather than in the judicial sense and refers to a mental attitude or a disposition of the judge towards a party. In order for the alleged bias and prejudice to be disqualifying, it must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from participation in the case[.]

*In re C.N.H.,* 998 S.W.2d 553, 560 (Mo. App.S.D.1999).

[¶ 34.] Hoadley's argument for disqualification "do[es] not constitute [a] reasonable bas[is] to question the [trial court] judge's impartiality[.]" Canon 3E.(1). He has failed to show that, because the trial judge sentenced his co-defendants to death, that the judge had a "deep-seated favoritism or antagonism that would make fair judgment impossible." Furthermore, the trial judge made no determination as to the guilt or innocence of Hoadley. This responsibility was the province of the jury. Hoadley has failed to establish that the trial judge had a personal bias or that his impartiality was questionable.

[¶ 35.] **3. WHETHER THE TRIAL COURT ERRED IN NOT GRANTING A MISTRIAL AFTER CERTAIN REFERENCES TO ALLEGED OTHER ACTS OR CRIMES.**

[¶ 36.] On July 13, 2000, Hoadley's counsel filed a motion for prior notice of "other acts" evidence. The State filed notice of intent to offer other acts evidence, including evidence of the charge of conspiracy to distribute LSD. Following arguments on the admissibility of this evidence, the trial court determined that the evidence was more prejudicial than probative and denied its admission. During trial, the State submitted evidence of a tape and a transcript of a police interview with Hoadley. The tape and transcript contained references to questions concerning whether Hoadley and the others were under the influence of drugs at the time of the murder, why they fled the state after the murder, why they chose to murder Poage, and a reference to the LSD conspiracy charge. Hoadley's counsel did not object to the evidence, but later moved for a mistrial, which was denied. Hoadley argues that the trial court erred in not declaring a mistrial after the State submitted the tape and transcript into evidence.

[¶ 37.] Evidence of "other acts" may be admissible as res gestae evidence, which is an exception to SDCL 19–12–5 or Federal Rule 404(b). This Court has stated that "[e]vidence of uncharged criminal activity is not considered other crimes evidence if it arose out of the same transaction or series of transactions as the charged offense." *State v. Andrews,* 2001 SD 31, ¶¶ 9–11, 623 N.W.2d 78, 81 (citing *Goodroad,* 1997 SD 46 at ¶ 10, 563 N.W.2d at 130). We have "approved the admission of other crimes where such evidence is 'so blended or connected' with the one[s] on trial ... that proof of one incident involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged." *Id.* (citation omitted).

[¶ 38.] Three of the four references complained of in the tape and transcript fall within the res gestae exception to SDCL 19–12–5. These references arose from the same transaction or criminal ac-

tivity and can be used to explain the circumstances surrounding Poage's murder. The reference pertaining to whether Hoadley was under the influence of drugs at the time of the murder is relevant as to the motive and mindset of Hoadley. The reference pertaining to the reason Hoadley and the others fled the state after the murder is relevant on the issue of guilt. The reference pertaining to the reason Poage was murdered is relevant to explain motive and state of mind. The challenged references in the tape and transcript provided evidence relating to the murder itself.

[¶ 39.] While the reference concerning the LSD conspiracy charge does not relate to the murder and may not be relevant to explain any of the circumstances surrounding the murder, Hoadley's counsel failed to object to its admission at trial, waiting instead until the following day to move for a mistrial. In addition, any error "must also be shown to be prejudicial error." *Perovich*, 2001 SD 96 at ¶ 11, 632 N.W.2d at 15–16 (quoting *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251, 258 (S.D.1976)) (citation omitted). Hoadley has failed to establish that its admission was sufficiently prejudicial to warrant a new trial.

[¶ 40.] Hoadley has failed to show that the trial court abused its discretion in denying the motion for mistrial.

[¶ 41.] 4. **WHETHER THE TRIAL COURT ERRED IN ADMITTING TRANSCRIPTS OF HOADLEY'S STATEMENTS.**

[¶ 42.] Hoadley argues that it was improper to provide the jury with transcripts of his interview with the police. He claims that the transcripts not only drew "the attention of the jury away from the best evidence," but were inaccurate, thereby making it difficult for the jury to properly

judge the credibility of the witnesses and examine the evidence.

[¶ 43.] The Eighth Circuit has determined that "[t]he use of typed transcripts as visual aids to the jury in listening to the playback of the recorded communications is a matter within the sound discretion of the trial judge." *United States v. John*, 508 F.2d 1134, 1141 (8th Cir.1975). This Court has also concluded that it is well within the trial court's discretion to allow the use of transcripts. *State v. Faehnrich*, 359 N.W.2d 895, 899 (S.D.1984). The trial court read the transcripts and watched the video from which the transcripts were made. It concluded that the transcripts were as accurate a representation of the video as could be achieved and determined that their use would not be problematic or prejudicial. Furthermore, the trial court corrected any inaccuracies which could have proved problematic for the jury. Hoadley has failed to establish that the trial court abused its discretion in allowing the use of the transcripts.

[¶ 44.] 5. **WHETHER THE TRIAL COURT ERRED IN DENYING HOADLEY'S PROPOSED LESSER–INCLUDED OFFENSE INSTRUCTIONS ON HOMICIDE.**

[¶ 45.] Hoadley argues that he was entitled to lesser-included offense instructions on the first degree, premeditated murder count on which he was convicted. He claims the trial court erred in denying his proposed jury instructions on second degree murder, first degree manslaughter and second degree manslaughter because he claims there was evidence to support his contention that he did not intend to kill Poage. The trial court concluded that a rational jury would have found that the evidence supported only the offense on which Hoadley was convicted.

[¶ 46.] The crime that Hoadley was charged with and convicted of is defined by SDCL 22–16–4. It provides:

> Homicide is murder in the first degree when perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being, or when committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throwing, placing, or discharging of a destructive device or explosive. Homicide is also murder in the first degree if committed by a person who perpetrated, or who attempted to perpetrate, any arson, rape, robbery, burglary, kidnapping or unlawful throwing, placing or discharging of a destructive device or explosive and who subsequently effects the death of any victim of such crime to prevent detection or prosecution of the crime.

[¶ 47.] SDCL 22–16–7 defines murder in the second degree. It provides: "Homicide is murder in the second degree when perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect death of any particular individual." SDCL 22–16–8, which defines murder in the second degree also, provides: "Homicide perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, is not the less murder because there was no actual intent to injure others." "Manslaughter in the second degree is defined as a reckless killing of another and explicitly excludes manslaughter in the first degree from its definition." *Andrews*, 2001 SD 31 at ¶ 22, 623 N.W.2d at 84 (citing SDCL 22–16–20).

[¶ 48.] Hoadley argues that the lesser-included offenses of second degree murder and manslaughter should have been considered because he never intended to kill Poage. He claims that his act of throwing heavy rocks on Poage's head should not be interpreted as an intent to kill him, but as an attempt to stop him from moaning and moving. He argues that the facts, interpreted in this light, are sufficient to support lesser-included offense instructions because he lacked a "design to effect death" as is required under the first degree murder instruction.

[¶ 49.] "In order to instruct the jury on a lesser-included offense, both a legal and a factual test must be met. If one test is not satisfied, the other test need not be addressed." *Id.* at ¶ 23 (citing *State v. Black*, 506 N.W.2d 738, 744 (S.D. 1993)). The legal test is satisfied if:

> (1) ... the elements of the included offense are [the same or] [8] lesser in number than the elements of the greater offense;
>
> (2) the penalty for the lesser-included offense must be less than that of the greater offense; and
>
> (3) both offenses must contain common elements so that the greater offense cannot be committed without also committing the lesser offense.

*State v. Tammi*, 520 N.W.2d 619, 621–22 (S.D.1994) (citing *State v. Wall*, 481 N.W.2d 259, 264 (S.D.1992)). "The legal test also requires that the essential elements of the lesser offense must be incorporated into the corpus delicti of the greater offense." *State v. McGarrett*, 535 N.W.2d 765, 768–69 (S.D.1995) (additional citations omitted).

---

**8.** The counting of elements for this purpose should be based on substance, not technicality.

[¶ 50.] The elements of the lesser offense of manslaughter must be included in the greater offense of murder. *See Black*, 506 N.W.2d at 742 (quoting *State v. Kafka*, 264 N.W.2d 702, 705 (S.D.1978) (Zastrow, J., concurring) (stating "all the legal ingredients of the corpus delicti of the lesser offense [of manslaughter] must be included in the elements of the greater offense [of murder]")). *See also* SDCL 22–16–2 (stating "no person can be convicted of murder or manslaughter . . . unless the death of the person alleged to have been killed, and the fact of the killing by the accused are each established as independent facts beyond a reasonable doubt"). Here, the elements of the lesser offense of manslaughter are included in the greater offense of murder. Therefore, the legal test is satisfied under these circumstances.

[¶ 51.] The duty of the trial court to instruct is determined by the evidence. "In order to meet the factual test, evidence must be presented that would support a conviction on the lesser charge." *Black*, 506 N.W.2d at 744 (citations omitted). *See also State v. Gregg*, 405 N.W.2d 49, 51

(S.D.1987) (holding evidence was insufficient to support instruction on a lesser offense).

[¶ 52.] The evidence in this case did not support instruction on lesser-included offenses. Hoadley's argument that he did not intend to kill Poage is contrary to his actions. In this sense, actions speak louder than words. His argument is insufficient to support a rational conclusion other than a conviction of first degree murder. *See Black*, 506 N.W.2d at 744 (denying lesser-included offense instructions because "a rational jury would have found the evidence supported only the offense of which [defendant] was convicted"). There is sufficient evidence that Hoadley, Piper and Page planned the murder of Poage so that they could steal his property. They tortured Poage for several hours before finally killing him. Therefore, the factual test is not satisfied.[9]

[¶ 53.] Hoadley has failed to show that the trial court erred in refusing to instruct the jury on lesser-included offenses as the evidence was insufficient to support them.

---

9. While Justice Konenkamp's writing is a well-written analysis of the problems associated with lesser-included instructions, if taken literally, it would require a reversal and new trial. He states that: "Our [legal/factual] test is problematic because it requires trial and appellate courts to decide whether evidence is 'sufficient' to support giving the lesser-included offense instruction under the factual branch of the test." He advocates adoption of the elements test or only the legal branch of the legal/factual test.

Justice Konenkamp concludes under the elements test that there is *no* evidence supporting the giving of a lesser-included offense instruction on homicide. There is however, *some* evidence to support the giving of an instruction on lesser-included offenses of homicide. Although he claims otherwise, Justice Konenkamp is making the same judgment call under the elements test that we are making under the factual test.

1. The fact that Hoadley, Piper and Page stole a .22 caliber pistol and did not use it to kill Poage is arguably some evidence supporting a lesser-included offense instruction on homicide.
2. The fact that Hoadley, Piper and Page initially planned to steal from Poage and beat him is arguably some evidence supporting a lesser-included offense instruction on homicide.
3. The fact that Hoadley, Piper and Page laboriously tortured Poage for hours rather than killing him quickly is also some evidence supporting a lesser-included offense instruction on homicide.

In other words, although there is some evidence, it is insufficient to support a lesser-included offense instruction on homicide in this case. Accordingly, we can say, as a matter of law, that the evidence was insufficient to require lesser-included offense instructions on homicide in this case.

[¶ 54.] For all of the foregoing reasons, we affirm.

[¶ 55.] **GILBERTSON, Chief Justice, and AMUNDSON, KONENKAMP and ZINTER, Justices, concur as to issues 1, 2, 3 and 4.**

[¶ 56.] **GILBERTSON, Chief Justice, and KONENKAMP and ZINTER, Justices, concur as to the result in issue 5.**

[¶ 57.] KONENKAMP, Justice, delivers the writing on Issue 5, which controls the rationale.

[¶ 58.] It is time to abandon our confusing and problematic test for deciding whether to give lesser-included instructions. Our test is confusing because, after *State v. Black*, 506 N.W.2d 738 (S.D.1993) (Black II), we have a melding of a *corpus delicti* test with the preexisting "legal/factual" test used less than nine months before in *State v. Black*, 494 N.W.2d 377 (S.D.1993) (Black I).[10] Our test is problematic because it requires trial and appellate courts to decide whether evidence is "sufficient" to support giving the lesser-included offense instruction under the factual branch of the test.[11] No better example can be found than the one in the minority writing on this issue, when it weighs the facts here and, in effect, "finds" that Hoadley's actions spoke louder than his words.

10. The *corpus delicti* language was originally imported from several California cases and one Utah case in *State v. Barber*, 83 S.D. 289, 158 N.W.2d 870 (1968). Like Michigan courts, California courts, even after the Supreme Court's decision (in *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)) that Federal courts are to use the "elements test" (i.e., the legal branch of our "legal/factual" test), rather than the competing "inherent-relationship" test, continue to use the latter. Tim Dallas Tucker, *State v. Black: Confusion in South Dakota's Determination of Lesser–Included Offenses in Homicide Cases*, 41 S.D.L.Rev. 465, 487 (1996). But the inherent relationship test, to which the *corpus delicti* language is implicitly wed, is fundamentally different from (at least) the legal branch of the legal/factual test. *See* Tucker, *State v. Black*, 41 S.D.L.Rev. at 482–487.

11. The word "sufficient" is crucial to the controversy here; its use in this context derives from *State v. Gregg*, 405 N.W.2d 49 (S.D. 1987). "The essence of the factual test is that there must be *sufficient* evidence, when read in the light most favorable to the defendant, which would justify the jury in concluding that the greater offense was not committed and that a lesser offense was in fact, committed." *Id.* at 51 (citing *State v. Oien*, 302 N.W.2d 807, 809 (S.D.1981)) (emphasis added). *Oien*, in turn, cites to *People v. Karasek*, 63 Mich.App. 706, 234 N.W.2d 761, 766 (Mich.App.1975), and to Justice Zastrow's special concurrence in *State v. Kafka*, 264 N.W.2d 702, 706 (S.D.1978), in both of which precisely the same language is used. Interestingly, however, Justice Zastrow's only authority for this "sufficient-evidence" test is none other than the same citation to *Karasek*. Thus, the sufficient-evidence test, labeled, in *Gregg*, the "factual test," was imported into South Dakota jurisprudence from a Michigan Appeals Court decision, not *via* a majority or even a plurality opinion of this Court, but only *via* a special concurrence written by one justice. Michigan courts, like California courts, use the "inherent relationship" test, rather than the "legal/factual test," which, for all of eight years—from *State v. Waff*, 373 N.W.2d 18 (S.D.1985) through *Black I* (early 1993)— had been the law in South Dakota. Given the mish-mash of its provenance, it is not surprising that Justice Wuest found South Dakota law on lesser-included instructions to have been left, after *Black II*, "in utter confusion." 506 N.W.2d at 745 (Wuest, J., concurring in result). But the fundamental reason that our lesser-included-offense law is problematic as well as confusing is that to apply the "sufficient-evidence" test (i.e., a strong version of the factual branch of our legal/factual test), as this Court did in *Black II* and is doing again in this case, is to "t[ake] the factual question away from the jury." Tucker, *State v. Black*, 41 S.D.L.Rev. at 501.

[¶ 59.] In keeping with modern jurisprudence, factual questions should be left to the jury. In Apprendi v. New Jersey, the Supreme Court held that except for "the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory minimum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490, 120 S.Ct. 2348, 2362–63, 147 L.Ed.2d 435 (2000). The force of the reasoning that supported the Apprendi decision extends beyond the particulars of that case. At stake in Apprendi were "constitutional protections of surpassing importance: the proscription of any deprivation of liberty without 'due process of law' (per Amendment 14), and the guarantee that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury' (per Amendment 6)." Id. at 476–77, 120 S.Ct. at 2355.

[¶ 60.] Although the Apprendi Court recognized that trial practices may "change in the course of centuries and still remain true to the principles that emerged from the Framers' fears 'that the jury could be lost not only by gross denial, but by erosion,' " it was unequivocal in asserting that "practice must at least adhere to the basic principles undergirding the requirements of trying to a jury all facts necessary to constitute a statutory offense, and proving those facts beyond reasonable doubt." Id. at 483–84, 120 S.Ct. at 2359 (internal quotation omitted). Furthermore, "it is unconstitutional for a [state] legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a crimi-nal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." Id. at 490, 120 S.Ct. at 2363.

[¶ 61.] To prevent the unconstitutional result of taking criminal cases from the jury, we should use only the "elements" test (i.e., legal branch of the legal/factual test) to decide whether the lesser offense is included in the greater charged offense.[12] We should eliminate both the corpus delicti test introduced in Black II and the substantial-evidence test.[13] The elements test was clearly set forth in Black I.

> The legal test is met if (1) all of the elements of the included offense are lesser in number than the elements of the greater offense; (2) the penalty for the included lesser offense must be less than that of the greater offense; and (3) both offenses must contain common elements so that the greater offense cannot be committed without also committing the lesser offense.

494 N.W.2d at 379.

[¶ 62.] Most state jurisdictions use some version of the elements test, and the Supreme Court has adopted a similar test to be used in federal courts: "one offense is not 'necessarily included' in another unless the elements of the lesser offense are a subset of the elements of the charged offense. Where the lesser offense requires an element not required for the greater offense, no instruction is to be given . . . ." Schmuck, 489 U.S. at 716, 109 S.Ct. at 1450, 103 L.Ed.2d at 746. The virtue of the elements test was explained in Schmuck:

---

12. In adopting the elements test, we should also adopt Judge Tucker's suggestion that "mens rea components [be] considered [to be] lesser elements contained within the greater offense." Tucker, State v. Black, 41 S.D.L.Rev. at 496.

13. The reasons for eliminating the corpus delicti test are clearly and persuasively set forth in Judge Tucker's article, 41 S.D.L.Rev. at 491–495, and it is unnecessary to repeat them here. The reasons for eliminating the sufficient-evidence test are provided in the text, infra, at ¶ 63.

[T]he elements test is far more certain and predictable in its application than the inherent relationship approach. Because the elements approach involves a textual comparison of criminal statutes and does not depend on inferences that may be drawn from evidence introduced at trial, the elements approach permits both sides to know in advance what jury instructions will be available and to plan their trial strategies accordingly. The objective elements approach, moreover, promotes judicial economy by providing a clearer rule of decision and by permitting appellate courts to decide whether jury instructions were wrongly refused without reviewing the entire evidentiary record for nuances of inference.

*Id.* at 720–21, 109 S.Ct. at 1453.

[¶ 63.] As for the reasons to discard the sufficient-evidence test, we owe to Justice Amundson's dissent in *Black I* the reference to an exemplary passage explaining the simplicity of the elements test:

When there is *any evidence whatever* tending to establish a certain statutory grade of criminal homicide, and the court refuses to charge the jury with reference thereto, error is committed; but if there be a total absence of evidence relating to the particular grade disregarded, the charge cannot be successfully challenged on the ground of such omission.

494 N.W.2d at 387 (Amundson, J., dissenting) (citing *Crawford v. People,* 12 Colo. 290, 20 P. 769 (Colo.1889) (emphasis added)). If *no* evidence has been presented that would support a conviction on a lesser charge, then instructions on the lesser charge shall not be given. Trial courts need not instruct on matters unsupported by the evidence. *State v. Woods,* 374 N.W.2d 92, 96 (S.D.1985), *cert. denied,* 495

U.S. 920, 110 S.Ct. 1952, 109 L.Ed.2d 314 (1990).

[¶ 64.] A lesser-included-offense instruction should be given when (1) the elements test is met and (2) some evidence in support of such instructions exists in the record. Because the elements test was met in this case, the only question remaining is whether there was *some* evidence to support giving the instruction.[14] In reality, there was *no* evidence to justify giving a lesser-included offense instruction. First, to say one did not intend the victim's death is to say little more than to plead not guilty. A general denial, like a not guilty plea, effectively places in issue each element in the charged offense, but it does not create any affirmative evidence to entitle a defendant to a lesser-included offense simply because the offense is denied. Logically, to justify a lesser-included offense in a homicide case there must be some tangible particulars in the record tending to negate the higher offense.

[¶ 65.] Second, we must consider the stated intent of the three defendants before they kidnapped the victim, the horrendous violence they perpetrated against him, the defendant's admission that he stabbed the victim and held a light while a codefendant kicked him in the head, his admission that he struck the victim's head with two heavy rocks in an obvious *coup de grace,* and finally, the fact that the defendant checked the victim for a pulse and said to one of his codefendants "dude I think he's dead, dude can we go now?" In light of all this, defendant's claim that he only wanted the victim to "at least stop moving" is no more proof of lack of premeditation than wanting to still only the heart that beats in Caesar's breast is proof of lack of intent to assassinate. Thus, although the elements test should be the only determiner in deciding whether to instruct the jury on the lesser offenses, we

---

**14.** The question is *not,* we emphasize, whether there was *sufficient* evidence.

nonetheless affirm the conviction because even under the elements test there must be some evidence to support giving a lesser offense instruction.

[¶ 66.] As Judge Tucker demonstrates in his excellent article cited several times above, "[t]he elements test provides certainty and predictability in determining lesser-included offenses and is compatible with the constitutional principles of double jeopardy, due process, and notice while maintaining mutuality. Moreover, the elements test will clarify the doctrine of lesser-included offenses for the bench and the Bar far better than the present law." *Tucker, State v. Black,* 41 S.D.L.Rev. at 501. We now acknowledge the wisdom of Judge Tucker's recommendations.

**AMUNDSON, Justice (concurring in part and dissenting in part).**

[¶ 67.] I dissent on issue 5 for the reasons set forth in my dissents in *State v. Black,* 494 N.W.2d 377 (S.D.1993) (Amundson J., dissenting) and *State v. Black,* 506 N.W.2d 738 (S.D.1993) (Amundson, J., dissenting). I concur on all other issues.