MEIERHENRY, Justice
(dissenting).
[¶ 55.] I dissent on issue two and would reverse the trial court’s denial of Bowker’s motion to suppress. I agree with the majority that “Buteyn’s initial question to Bowker when he encountered her while coming up the staire — i.e. whether she lived in the apartment-can be construed as a ‘general on-the-scene’ question in furtherance of the fact-finding process.” Supra ¶ 35. However, I disagree that Leach’s and Buteyn’s subsequent questions to her “can be similarly construed.” Id. The audio from the videotape of the alleged well-being check[7] along with the testimony of the officers, establish that Bowker was in custody and interrogated without first being made aware of her Miranda rights.
[¶ 56.] A review of the record supports Bowker’s claim that a reasonable person in her situation would have considered herself in custody. Before the officers entered the apartment, Bowker identified herself and protested that the police could not enter the apartment without a warrant. The officers ordered her to step back and not to move about while they entered to look around. Before inquiring as to her well-being, one of the officers asked her, “Why is Shaun out on the roof?” and, “What’s up with the broken glass out there?” Bowker immediately identified herself to the officers and told them she lived in the apartment with Shaun (Corbine). Within the first few seconds after entering the apartment, the officers had Bowker’s name, had corroborated Corbine’s story about living in the residence and had established that no one in the apartment was injured or in danger. Nevertheless, the officers still restrained Bowker’s movement. Officer Phillips testified that Bowker would not have been permitted to “walk around,” even after the well-being check. One of the officers ordered her not “to get crabby and reach for something.” To which she immediately replied, “I am not going to do nothing *72 crazy. Fuck! Fuck!” Consequently, Bowker remained seated on the couch in the snug 8' by 12' living room during the entire time the officers were in the apartment. Officer Phillips supervised her at all times.
[¶ 57.] Officer Phillips explained his role in securing Bowker’s movements and that she was not free to move about even after the “well-being” check. He described the situation as follows:
A: ... They [Officers Leach and Bu-teyn] would go downstairs and talk to a male individual. I would just basically stand in the living room [watching Bowker] for security reasons.
[[Image here]]
Q: And were other officers [Officers Leach and Buteyn] down there with Mr. Corbine?
A: At the bottom of the stairs outside, they were.
Q: So you were basically just there in a security capacity?
A: Yes.
[[Image here]]
Q: And in that capacity would you have let somebody, say walk around?
A: No.[8]
[¶ 58.] After the officers found the meth pipes in the adjoining bedroom and after they arrested Corbine, their attention turned to Bowker. Officer Leach, with the meth pipes in his hands, then began to question Bowker. Leach explained to her that the meth pipes were in plain view on the bed, chair and bedstand. He wanted to know if the pipes belonged to her, if she slept in the bedroom and if she knew that the pipes were in the bedroom.[9] He testified as follows:
*73 A. I asked her, it would have been before, when I was upstairs originally, I did ask her, I told her I found three pipes in the bedroom. I showed her the pipes. I asked her if they were hers. She stated they were not hers but she had seen them before.
Q. Seen them before, correct?
A. Correct.
Officer Leach testified that he also asked her questions about the living arrangements in the apartment as follows:
I did talk with Ms. Bowker. I asked her first of all her name. She stated her name was Frankie Bowker. Also asked her if she lived at this apartment. She stated she did not. Gave me an address on East 20th Street. She said that was where she lived. I did ask Ms. Bowker how often she does stay at the apartment here. She stated to me she stayed in the apartment four to five nights a week. I asked her if her children stayed with her. She stated when her children stay with her, she does stay out in the living room with them. I then asked her if she occasionally stays in the bedroom. She stated when her children were not with her, she does sleep in the bedroom.
While the officers questioned her, one can hear the officers on the audio 'actually having a discussion, apparently in front of her, about arresting her.
[¶ 59.] To ‘ determine if Bowker was in custody, we have to apply the test of “whether, under the totality of the circumstances, a reasonable person would not believe [herself] free to go.” State v. Corder, 460 N.W.2d 733, 736 (S.D.1990) (citing Terry v. State of Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). We have said that to distinguish between custodial and non-custodial interrogations it is important to analyze the “nature of the interrogator; nature of the suspect; time and place of the interrogation; nature of the interrogation; and purpose of the investigation.” State v. Bartunek, 323 N.W.2d 121, 124-25 (S.D.1982) (citation omitted).
[¶ 60.] Here, an analysis of the circumstances indicates that most of the questioning was in a custodial setting and that a reasonable person would not have believed she was free to go. Bowker first encountered the officers prior to 7:00 a.m., when the officers demanded entry into the residence without consent or a warrant.[10] Barging into the residence, the officers never explained to Bowker the purpose for *74 the abrupt invasion. The officers ordered Bowker to step back and not move. Once back in the apartment, the officers ordered her to sit on the couch and “not to get crabby and reach for something.” The officers continuously supervised her while they searched the apartment. During this entire time, she was not free to move around or leave. She observed the officers discover drug paraphernalia from Cor-bine’s bedroom. After this discovery, one of the officers yelled out the window to a fourth officer on the ground to arrest Cor-bine. At this time, the officers split up; Buteyn went downstairs to interrogate Corbine while Leach remained upstairs to interrogate Bowker. Phillips remained in the living room with Leach and Bowker for “security purposes.” With the drug paraphernalia held in front of Bowker, Leach interrogated Bowker about her knowledge and possible ownership of the drug paraphernalia. After a substantial amount of interrogation, Leach left Bowker, with Phillips still “supervising” her, and went downstairs to question Corbine and confer with Buteyn. Buteyn then returned to the apartment to interrogate Bowker further, at which point she was eventually arrested.
[¶ 61.] The questioning went beyond mere on-the-scene questioning or inquiry into her well-being. The questioning occurred substantially after the officers were aware that no one in the apartment was in danger or injured. Moreover, the interrogation happened after the officers had arrested Corbine. The officers remained in the apartment without consent “supervising” and questioning Bowker about her sleeping habits, residence, woman’s clothing and toys found near the drug paraphernalia and the drug paraphernalia itself. The questioning clearly was targeted at soliciting an admission from Bowker. We have said that when questioning goes beyond the purpose of general fact finding and is used to elicit a culpable response, Miranda warnings are required. State v. Myhre 2001 SD 109, ¶¶ 20-21, 633 N.W.2d 186, 190.
[¶ 62.] At no time did the officers inform Bowker of her Miranda rights, even though they were discussing whether to arrest her. A reasonable person in Bowker’s situation would have considered herself in custody. Therefore, based on the facts and circumstances surrounding the interrogation, I would conclude that Bowker was in custody and that the officers should have given Bowker her Miranda rights before they questioned her concerning whether she had knowledge of the drugs and paraphernalia. Ultimately, her answers were used by the State to prove she had knowledge. Her statements should have been suppressed as the fruit of an unlawful custodial interrogation.
[¶ 63.] The State claims that even if the trial court erred by not suppressing Bowker’s statements, the error was harmless. “Erroneous admission of statements obtained in violation of Miranda may constitute harmless error when there remains overwhelming independent evidence of guilt.” State v. Stanga, 2000 SD 129, ¶ 20 617 N.W.2d 486, 491 (citing Arizona v. Fulminante, 499 U.S. 279, 306, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302, 329 (1991); SDCL 15-6-61; SDCL 23A-44-14 (Rule 52(a))). We must be able to say that the error was harmless beyond a reasonable doubt. State v. Zakaria, 2007 SD 27, ¶ 19, 730 N.W.2d 140, 146 (citations omitted). We have explained harmless error as follows:
The harmless error doctrine preserves the essential purpose of criminal trials: to decide a defendant’s guilt or innocence. The rule promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable pres- *75 enee of immaterial error. The harmless error rule governs ... provided the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained. [Hjarmlessness must ... be determined on the basis of the remaining evidence. ■
Id. (citations omitted). When analyzing the effect the erroneously admitted evidence had on the trial, we need to consider the elements of the offense along with the other evidence. Id.
[¶ 64.] The court instructed the jury that the State had to prove that Bowker “knowingly [had] been in possession of methamphetamine” and “knowingly used or possessed with intent to use, drug paraphernalia.” The court further instructed that “the mere fact that a person is near a location or had access to a place where methamphetamine is found is not, by itself, sufficient proof of possession.” Crucial to the State’s case was proving that Bowker knowingly possessed illicit drugs and/or paraphernalia.
[¶ 65.] As evidenced by the prosecutor’s comments to the trial court and the jury, Bowker’s statements to the police played an important part in that proof. When settling instructions, the prosecutor asked the court to instruct the jury concerning admissions made by a defendant other than during the trial. The instruction read in part as follows:
A statement made by a defendant other than at his trial may be an admission.
An admission is a statement by a defendant admitting one or more of the facts at issue. It is not sufficient by itself to prove guilt of the crime charged, but it may prove one or more of the elements of the crime charged.
In support of the court giving the instruction, the prosecutor told the court, “I think the things [Bowker] said to the police are statements. They make up a good bit of probably the State’s case or the State’s argument.” Defense counsel objected to the instruction, and the court asked the prosecutor, “what statement would be an admission?” The prosecutor answered, “Well, [Bowker] had stayed there 10 to 14 nights in a row. That she had possessions there in the premises. That she had seen those three pipes before.”
[¶66.] Additionally, the prosecutor acknowledged that the main issue for the State in this case was proving that Bowker had knowledge. He said in his closing argument to the jury:
If there is an issue in the case which you could detect from the evidence offered by the defense as well as the cross examination of State’s witnesses, that would be the element of knowing possession of a controlled substance.
As to knowing, the knowing aspect of the possession, I submit to you that when the defendant told.the officers that morning that the pipes weren’t hers but she had seen them before, that is proof of her knowledge of those pipes. If you take that statement, that admission in the context of all the rest of the evidence in the case, it becomes an important admission, an important element of knowledge.
The prosecutor lists all the other pieces of evidence that showed that Corbine was involved with drugs and then again used Bowker’s statements to argue that she had knowledge:
I submit to you you couldn’t be within this house without knowing what was going on there. You certainly couldn’t be a girlfriend of Mr. Corbine for 90 days or four months, stay there four or five nights per week, stay there for 10 to
*76 14 nights in a row and not know what was going on.
* * *
She admitted to the officers she sometimes slept in that bedroom. She certainly had access to it.
[[Image here]]
So again, that State wasn’t required to prove use or ownership. The State was required to prove possession and the knowing exercise of dominion or control. She was in possession of the objects in question. She knew of their character and that’s why the first thing out of her mouth when she saw the cops was you can’t be here without a search warrant or words to that effect.
Then in rebuttal, the prosecutor summed up with the following:
She admitted she had seen the pipes before. She knows he is an addict. And the first words out of her mouth are you can’t come in here without a search warrant. I submit to you that that is strong evidence of consciousness, knowing possession of the illegal controlled substances within those premises.
[¶ 67.] Without Bowker’s statements to the police, the evidence against Bowker is not overwhelming. Besides her admissions, the other evidence against her consists mainly of her proximity to Corbine’s drugs and paraphernalia. The officers found her and her children staying in Cor-bine’s apartment where the evidence of drugs (most of the indicia of its presence was in the closet) and drug pipes were found. The officers evidently did not observe any signs that she had been using nor did she admit to using. Consequently, most of the State’s evidence of her “knowing possession” depended on three of her answers to the officers questions. First, the State placed a substantial amount of emphasis on her admission that “she had stayed there 10 to 14 nights in a row.” Second, the State relied heavily on the fact that she admitted that her possessions were in close proximity to the illicit items. Third, the State heavily touted Bowker’s admission that she had seen the three meth pipes in the residence. All of these statements/admissions derived from the custodial interrogation of Bowker.
[¶ 68.] Corbine testified in Bowker’s defense and explained that the only reason the meth pipes were in plain view was because he was rearranging his room that morning while Bowker slept in the living room with her children. He further testified that other paraphernalia was always hidden from Bowker. Corbine also claimed to be unaware of Bowker’s knowledge of the drug paraphernalia. Although the State can argue that the jury discounted Corbine’s testimony because he was a convicted drug felon, his testimony was before the jury.
[¶ 69.] Given the facts in this case, I am unable “to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained.” See Zakaria, 2007 SD 27, ¶ 19, 730 N.W.2d at 146 (citations omitted). This case should be reversed and remanded for a new trial with the evidence derived from the custodial interrogation suppressed.

. Although the majority says that the videotape was not offered into evidence for the second suppression hearing and should not be considered, the videotape actually was part of the entire record that the court clearly considered for both the original motion to suppress evidence and the second motion to suppress statements. The denial of both the suppression of evidence and statements were drafted together on a single order, which stated:
the [c]ourt having heard and considered the evidence and arguments of the párties together with the files and the records herein and having made and entered Findings of Fact and Conclusions of Law; now, therefore IT IS HEREBY ORDERED that Defendant's Motion to Suppress Re; Search of Residence and Motion to Suppress Statements be and the same here are denied.
Both denials utilized the same findings of fact and conclusions of law. Additionally, Bowker questioned a witness about the videotape and argued portions of it in the second hearing. No objections were made by the State. Clearly, the videotape was before the court and considered when the order was entered. Consequently, this Court must consider the same evidence for this de novo review.
The audio of the officers’ discussion (apparently between Buteyn to another officer) regarding whether they had enough information to enter the apartment progressed as follows: “I mean the cut [on Corbine's finger] is old; but, these guys just said he was up [on the roof]. And [Corbine] said he was up there cleaning the glass up.” This exchange suggests that the officers knew the wound on Corbine’s finger was old at the time of the well-being check, not “fresh” as the trial court and the majority opinion described it. Moreover, the audio also reveals the officers discussing whether or not to arrest Corbine. They settled on cuffing him and checking out the apartment before arresting him.

. The majority states that the fact finder "could reasonably have determined that Phillips’s reference to being alone with Bowker and restricting her movements in the apartment was in the context of his supervising her for officer safety while Buteyn and Leach were conducting the well-being check inside the bedroom, since under no other circumstances would Phillips have been present for 'security reasons.’ ” Supra ¶ 30 n3. Although I agree that Phillips claimed his sole purpose for supervising Bowker was for "security reasons,” I strongly disagree that the fact finder could reasonably fabricate a sequence of facts contrary to those argued or presented. Phillips unequivocally testified to the following:
State (cross-examination): Officer Phillips, do you have a clear distinct recollection of being alone with Ms. Bowker in that apartment — ■
Phillips: Yes.
State: At the time when both Officer Leach and Officer Buteyn were downstairs and outside talking to Mr. Corbine?
Phillips: Yes.
It is not reasonable for the trial court, nor the majority, to independently concoct a factual situation that contradicts the plain facts of this case without substantiating a reason for the contraiy finding.
Although the majority claims that the dissent relies chiefly on the videotape for this writing, the officers’ testimonies, such as the quoted portion above, are the foundation for this special writing. Indeed, the video recorded only a small fraction of the interrogation and captured no useful picture evidence. It is only useful to recreate a truthful tone of the officers’ entry into the apartment and the following few minutes inside, prior to the custodial interrogation. With regard to the custodial interrogation analysis, the testimony is where (he substantive analysis begins.

. During the "well-being” investigation, the .audio from the officers' on-person microphone cut off at two different times for a substantial period. The first audio void occurred immediately after the officers determined they would arrest Corbine. The second large chunk of missing audio corresponds with the complained-of questioning. Therefore, the only rendition of the officers’ questioning of Bowker is reconstructed from the officers’ testimony at the suppression hearing and trial.

. Both Officers Buteyn and Leach testified at the hearings and the trial that as they initially ascended the stairs to the apartment, Bowker appeared at the top landing and asked if they had a search warrant. The prosecutor used her question about the search warrant in his closing argument as follows:
There is only one reason why a person would say that. That's if they had guilty knowledge of what was within. They have a desire to protect the drug paraphernalia and substances that are within. They know about them. They are exercising dominion and control over them by preventing the police from seeing them. ■
I don't think you can't be here without a search warrant would be the first thing that would come out of anybody else’s mouth. You might say what are you doing. You might say what's going on. You might say has something happened to my child or my folks. You might say all kinds of things but unless you have a reason or unless you are a constitutionalist, a constitutional scholar and you have no evidence to believe she is, the first thing out of your mouth is not going to be you can't be here without a search warrant. That's what a drug user would say to a police officer. That’s not what a normal innocent citizen would say to a police officer under those circumstances.
The defense made no objection.