#24531-a-SLZ

**2009 SD 51**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

DAPHNE ANTRANETTE WRIGHT,                 Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT
OF THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE BRADLEY G. ZELL
Judge

* * * *

LAWRENCE E. LONG
Attorney General

MEGHAN N. DILGES
Assistant Attorney General           Attorneys for plaintiff
Pierre, South Dakota                 and appellee.

TRACI SMITH
Office of the Minnehaha County
 Public Defender                     Attorneys for defendant
Sioux Falls, South Dakota            and appellant.

* * * *

ARGUED ON MARCH 25, 2009

OPINION FILED **06/24/09**

#24531

ZINTER, Justice

[¶1.]      Daphne Wright appeals her convictions of premeditated murder, felony murder, and aggravated kidnapping. The appeal raises issues regarding the admissibility of Wright's statements to police, hearing-impairment accommodations provided at trial, minority representation in the jury pool, admission of prior acts, sufficiency of the evidence, and a question of double jeopardy. We affirm.

*Facts and Procedural History*

[¶2.]      In August 2004, Wright and her girlfriend Sallie Collins moved into the home of Wright's friend, Jackie Chesmore. Both Wright and Collins were deaf, and in September, Collins moved to an apartment complex known within the Sioux Falls deaf community as the "deaf apartments." While living there, Collins became friends with Darlene VanderGiesen, who was also deaf.

[¶3.]      Wright became jealous of VanderGiesen and thought that VanderGiesen was trying to destroy Wright's relationship with Collins. On February 1, 2006, Wright met VanderGiesen at a Pizza Hut restaurant ostensibly to plan a Valentine's Day surprise for Collins. VanderGiesen was never seen again. Two days after the meeting, VanderGiesen's father reported that his daughter was missing. The next day, police found VanderGiesen's vehicle abandoned in the Pizza Hut parking lot. VanderGiesen's car keys, house keys, wallet, and identification were missing. Police also found clothing matching the description of what VanderGiesen had been wearing on the last day she had been seen.

[¶4.]      Detectives examined VanderGiesen's computer and cell phone text messages. Detectives also obtained information from related communication

-1-

companies, which led police to VanderGiesen's friends in the deaf community. Both sources of information eventually led police to Chesmore's home. The investigators found that e-mails had been sent from Chesmore's computer to VanderGiesen's computer under the user name "Wendy." The e-mails advised VanderGiesen to stop visiting the deaf apartments and contained insults directed at VanderGiesen. Wright had also sent an e-mail under her name stating: "Hi this is Collins's lover as you know who am I [sic], right? am very disappointment [sic] in you because you always visit Collins when am [sic] not there, enough please, thanks . . . ."

[¶5.]        The day after these discoveries, Chesmore and Wright voluntarily drove together to the Sioux Falls law enforcement center (LEC) to be interviewed. Detective Olson interviewed Wright using a certified sign language interpreter. Olson informed Wright when she arrived for the interview that he was conducting a missing person investigation. He also advised Wright that she was not being charged with a crime, she was free to leave, and she could stop the questioning at any time. Wright was not advised of her *Miranda* rights.

[¶6.]        During the interview, Wright initially denied sending the e-mails to VanderGiesen. However, when Detective Olson informed her that he possessed contrary information from the communication companies, Wright admitted that she was the person who sent all of the e-mails. Wright also repeatedly changed her story regarding her meeting with VanderGiesen at the Pizza Hut. Originally, she denied any meeting, stating that the last time she talked to VanderGiesen was on January 29. Later, she indicated that she was supposed to meet VanderGiesen at the Pizza Hut, but Wright could not go because her car was out of gas. Ultimately,

she admitted that she did meet VanderGiesen at the Pizza Hut on February 1st, that they spoke for about five minutes in the parking lot, but that Wright cancelled the meeting because she did not have enough money to eat.

[¶7.]     The interview lasted from 10:49 a.m. until 12:54 p.m. Approximately one hour into the interview, Detective Olson reminded Wright that she was free to leave and could stop the questioning at any time. Wright did not request to leave or stop the questioning. Instead, she consistently denied having any knowledge of VanderGiesen's disappearance.

[¶8.]     The parties agree that at 12:54 p.m., Wright unequivocally asked for an attorney. At that time, based upon her inconsistent statements and the information discovered during the investigation, police obtained and executed a search warrant on Wright's person, home, and vehicle. Although she was not further interviewed, Wright was not allowed to go back to her home while the warrant was being executed. Police kept Wright at the LEC until 6:10 p.m., when the search of her person was concluded.

[¶9.]     The search of Wright's vehicle revealed reddish stains on the rear bumper that appeared to be blood. Subsequent DNA testing reflected that the blood matched VanderGiesen's profile. A search of Wright's bedroom in Chesmore's home revealed a receipt from a hardware store. The receipt reflected that Wright had purchased an electric chainsaw on February 3, 2006. The search of Chesmore's basement revealed fresh blue paint under which the police discovered cut marks in the concrete floor. Testing confirmed the presence of VanderGiesen's DNA under the paint. A further search of the floor and walls of the basement revealed bone,

muscle, and blood fragments matching VanderGiesen's DNA. Following these discoveries, Wright was arrested and indicted on charges of murder in the first degree (premeditated murder), murder in the second degree (felony murder), and aggravated kidnapping.

[¶10.] Prior to trial, psychologist Dr. McCay Vernon conducted an evaluation of Wright. Based on testing, he determined that Wright had the reading ability of a third-grader. A Bender Gestalt assessment suggested the possibility of brain damage, yet Wright's non-verbal IQ was 114 to 117. While Dr. Vernon indicated that Wright had a very good grasp of American Sign Language (ASL), he also testified that there were many commonly used legal terms for which there were no signs. He further testified that it was difficult to convey many legal concepts to a person such as Wright, who was "prelingually deaf," meaning that she became deaf before learning language.[1] Dr. Vernon recommended that trial testimony be interpreted to Wright consecutively, rather than simultaneously. Dr. Vernon opined that although the court could accommodate Wright through the use of real-time captioning, in which Wright could see what the court reporter was typing, it would be of little use to Wright because of her limited comprehension levels.

[¶11.] Based on Dr. Vernon's testimony, Wright moved for consecutive interpretation during trial proceedings. Following denial of that motion, Wright moved for reconsideration and the appointment of a certified deaf interpreter

---

1. Wright lost her hearing at the age of ten months following an episode of rubella.

#24531

(CDI).[2] At the second hearing, Professor Michele LaVigne, from the University of Wisconsin Law School, testified that Wright communicated quite well with ASL when carrying on a casual conversation. Professor LaVigne noted, however, that when she tried to communicate with Wright about what was happening with Wright's case, "[a]ll of a sudden the communication . . . was like we hit a brick wall. . . . It was very, very difficult and incomplete."

[¶12.] The circuit court denied Wright's motion for reconsideration and motion for employment of a CDI, explaining that it would provide a number of alternative accommodations. First, instead of employing a CDI to interpret consecutively in the courtroom, the court provided a CDI to assist Wright and counsel in communicating before the proceedings. Second, the court provided five level-five certified ASL interpreters: three to interpret what was occurring in the courtroom and two to sit at counsel table to facilitate communication between Wright and her counsel. Third, the court provided real time captioning, in which every word the court reporter transcribed was simultaneously projected onto a computer screen for Wright and other participants to read. Fourth, at Wright's request, the trial was videotaped, which captured the ASL interpreters' hands. Fifth, daily DVDs of the trial proceedings were provided for Wright's review every

---

2. A CDI is an individual who is deaf or hard of hearing. In CDI interpretation, a communication passes from a hearing person to hearing interpreter (a hearing person who interprets) to the deaf interpreter (a deaf person who interprets) to a deaf person. The response passes from the deaf person to the deaf interpreter to the hearing interpreter and then to the hearing person. Linton v. State (*Linton II*), 275 SW3d 493, 510 (TexCrimApp 2009) (Johnson, J., concurring).

evening. Wright and defense counsel were then given an opportunity each morning to apprise the court of any communication problems that may have arisen during the prior day. Finally, the court provided Wright the opportunity to take breaks at any time during the proceeding if she was having difficulty understanding what was occurring.[3]

[¶13.] The State's theory at trial was that on February 1, 2006, Wright invited VanderGiesen to the meeting at Pizza Hut as a ruse, and that at some point after they met, Wright struck VanderGiesen on the head with a blunt object, leaving a seven-inch skull fracture. According to the State's theory, Wright also tightly cinched a plastic bag over VanderGiesen's head, cutting off her oxygen supply. Dr. Brad Randall testified that the cause of VanderGiesen's death was either "blunt force head trauma or suffocation or both." Wright's expert, Dr. Donald Habbee, agreed with Dr. Randall as to the cause of VanderGiesen's death.

[¶14.] The State also presented evidence that Wright tried to cover up the killing by attempting to burn VanderGiesen's body. When this failed, Wright, in the basement of Chesmore's home, dismembered VanderGiesen's body with the electric chainsaw. Chesmore testified that when she arrived home from work on February 3, 2006, she observed Wright cleaning and removing carpet remnants from the basement. She also observed Wright loading bags of garbage and chunks of concrete into the back of Wright's vehicle.

---

3. Wright only requested one break, which was during jury selection. The court provided the break.

[¶15.] Allegedly, Wright then disposed of VanderGiesen's legs and lower torso in a dumpster behind a store near Chesmore's home. Those body parts were discovered in an area landfill on February 11, 2006. An American Sign Language sweatshirt that belonged to VanderGiesen was discovered in the landfill with the body parts. DNA from both VanderGiesen and Wright was found on the sweatshirt. The State alleged that Wright disposed the remaining portion of VanderGiesen's body in a roadside ditch in Minnesota, not far from the South Dakota border.

[¶16.] The jury returned a verdict of guilty on all three counts. The jury found that a death sentence should not be imposed. The court sentenced Wright to concurrent life sentences on the premeditated murder and aggravated kidnapping convictions. The court imposed no sentence on the felony murder conviction.

[¶17.] Wright appeals raising the following issues: (1) whether the circuit court erred in denying Wright's motion to suppress statements made during her interview at the LEC; (2) whether the circuit court should have granted Wright's request for consecutive interpretation and a CDI; (3) whether the system of selecting jurors violated Wright's constitutional rights; (4) whether the circuit court erred in allowing evidence of a prior altercation involving Wright, VanderGiesen, and Collins; (5) whether there was sufficient evidence to support the convictions; (6) whether the convictions for kidnapping and felony murder violated the Double Jeopardy Clause; and, (7) whether cumulative error denied Wright a fair trial.

*Decision*

*1. Wright's Statements.*

[¶18.] Wright contends that her statements made to police during her interview should have been suppressed because: (A) she was in custody and was not advised of her *Miranda* rights; (B) she was denied requests to consult with an attorney; and (C) her statements were involuntary. In reviewing the circuit court's rulings on Wright's Fifth Amendment contentions, "[w]e review findings of fact under the clearly erroneous standard. Once the facts have been determined,[4] however, the application of a legal standard to those facts is a question of law reviewed de novo." State v. Ball, 2004 SD 9, ¶21, 675 NW2d 192, 199 (quoting State v. Hodges, 2001 SD 93, ¶8, 631 NW2d 206, 209).

> *A. Whether Wright's Interview was a Custodial Interrogation Requiring a Miranda Advisement.*

[¶19.] At no time during Wright's interview did the police advise Wright of her *Miranda* rights. "[P]olice officers are not [,however,] required to administer *Miranda* warnings to everyone whom they question." State v. Aesoph, 2002 SD 71, ¶17, 647 NW2d 743, 751 (quoting State v. Thompson, 1997 SD 15, ¶23, 560 NW2d 535, 540). Rather, *Miranda* warnings are required only when there is a custodial interrogation. *Id.* As this Court explained in *State v. Johnson,* a *Miranda* warning is not required in non-custodial situations because:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the

---

4. At oral argument, Wright conceded there is no disagreement regarding the historical facts.

> questioned person is one whom the police suspect. *Miranda*
> warnings are required only where there has been such a
> restriction on a person's freedom as to render [her] 'in custody.'

2007 SD 86, ¶22, 739 NW2d 1, 9 (citation omitted). In making that custody

determination, a two-part test is utilized.

> [F]irst, what were the circumstances surrounding the
> interrogation; and second, given those circumstances, would a
> reasonable person have felt he or she was not at liberty to
> terminate the interrogation and leave. Once the scene is set and
> the players' lines and actions are reconstructed, the court must
> apply an objective test to resolve the ultimate inquiry: was
> there a formal arrest or restraint on freedom of movement of the
> degree associated with a formal arrest.

*Id.* (citation omitted).

[¶20.]     The State argues that an objective view of the circumstances *at the*

*time Wright was actually interviewed* (between 10:30 a.m. and 12:54 p.m.) reflects

that she was not so deprived of her freedom as to be in custody for purposes of

*Miranda.* There is no dispute that no restraints were placed on Wright and she was

told she was free to leave during this period of time. Wright, however, argues that

she "did not feel free to leave," she felt "tremendous negative pressure," and "she

felt that she had no choice" but to participate in the interview. (Appellant's Br. 25)

Wright's "subjective thoughts are not a proper basis for the determination of

whether [she] was in custody." State v. Myhre, 2001 SD 109, ¶18, 633 NW2d 186,

190 (quoting State v. Herting, 2000 SD 12, ¶13, 604 NW2d 863, 866). "[T]he . . .

determination of custody depends on the objective circumstances of the

interrogation, not on the subjective views harbored by either the interrogating

officers or the person being questioned." *Herting*, 2000 SD 12, ¶9, 604 NW2d at 865

(quoting *Thompson*, 1997 SD 15, ¶25, 560 NW2d at 540). Further, even if Wright's

subjective feelings were relevant, Wright did not testify at the suppression hearing or at trial, so there is no evidence to support her appellate argument of feeling subjective pressure.

[¶21.]    In examining the objective circumstances of this interview, the circuit court found and concluded that:

> [Wright] was not in custody at the time of the interview with Detective Olson, as [Wright] was not under arrest at the time of her interview with Detective Olson, [Wright] voluntarily submitted herself to the interview process, [Wright] was told she was free to leave and in fact was allowed to leave the [LEC] after her person was searched pursuant to a warrant obtained after her interview[.]

> That because [Wright] was not in custody during her interview Detective Olson was not required to inform [Wright] of <u>Miranda</u> Rights.

Our review of the record supports the circuit court's findings and conclusion.

[¶22.]    The record reflects that Wright voluntarily came to the LEC and agreed to speak with the police while under no restraint until 12:54 p.m. Under those circumstances, a defendant is generally not considered in custody for purposes of *Miranda*. *See Myhre*, 2001 SD 109, ¶17, 633 NW2d at 190 (noting that "[i]n *State v. Anderson*, [2000 SD 45, ¶77, 608 NW2d 644, 666,] we recognized that [a defendant's] voluntary acceptance of an invitation to the police station and his choosing to speak with the police while not restrained in any way did not constitute custodial interrogation"). Similarly, in *State v. Darby*, we considered analogous circumstances concluding:

> The door to the room in which [the officer] interviewed [defendant] was unlocked, of which he was aware, but was closed for privacy. We have previously held that a closed, or even a locked, door does not, in and of itself, create a custodial

> interrogation.  No restraints were placed on [defendant], and he was free to move about the room and free to leave. . . .  We do not find error in the trial court's conclusion that [defendant] was not in custody *at the time of the interview*[ ] . . . at the police station.

1996 SD 127, ¶26, 556 NW2d 311, 319 (citation omitted) (emphasis added).

[¶23.]     Although the record does reflect that Wright was not permitted to leave *after* her request for counsel at 12:54 p.m., all questioning stopped at that time.  Additionally, the initial 12:54 p.m. restriction on Wright's freedom of movement was simply a request that she step back into the interrogation room so another interviewee could pass without the two of them seeing each other.  Thereafter, the officers specifically informed Wright that she was not under arrest and that she was being detained solely for the purpose of executing the search warrant.  Although she was then detained for that purpose until 6:10 p.m., no further questioning occurred.

[¶24.]     It is also significant that at the time Wright was actually interviewed, she was not a suspect.  VanderGiesen's body had not been found and the police were only investigating a missing persons matter.  Detective Olson informed Wright that she was not charged with any crime, that she was free to leave, and that she could stop the questioning at any time.  Olson demonstrated that the door was unlocked and reminded Wright later in the interview that she was free to leave.  There is simply no evidence suggesting that at the time she was actually interviewed, there was a formal arrest or restraint on Wright's freedom of movement of the degree associated with a formal arrest.

[¶25.]     Wright, however, contends that her detention after 12:54 p.m. belies Detective Olson's earlier statements that she was free to leave. This after-the-fact argument regarding the subjective intent of Detective Olson focuses on the incorrect legal test and on the incorrect time for making the assessment. The proper inquiry involves an objective examination considering whether a reasonable interviewee, under the circumstances existing at the time of the interview, would have felt that she was not at liberty to terminate the interview and leave. *Johnson*, 2007 SD 86, ¶22, 739 NW2d at 9; *Thompson*, 1997 SD 15, ¶25, 560 NW2d at 540 (citing Stansbury v. California, 511 US 318, 323, 114 SCt 1526, 1529, 128 LEd2d 293, 298 (1994)). *See also* Bradley v. Weber, 1999 SD 68, ¶14, 595 NW2d 615, 620 (noting that the defendant "was not in custody *at the time of the interview* and therefore he was not entitled to *Miranda* warnings") (emphasis added); State v. Ferguson, 84 SD 605, 613, 175 NW2d 57, 62 (1970) (providing, "*[a]t the time of the interview* defendant was not in custody or otherwise deprived of his freedom by any authorities") (emphasis added).

[¶26.]     In this case, a review of the custodial circumstances existing at the time of the interview reflects that a reasonable person would have understood that they were at liberty to terminate the interview and leave. Ultimately, there is "no indication that [Wright] was coerced into making any statements through the 'inherently compelling pressures' of a custodial setting." *Johnson*, 2007 SD 86, ¶28, 739 NW2d at 10 (citing Miranda v. Arizona, 384 US 436, 467, 86 SCt 1602, 1624, 16 LEd2d 694 (1966)).

> *B. Whether Wright Was Denied Her Fifth Amendment Right against Self-Incrimination/Right to Counsel.*

[¶27.]      Wright claims that her numerous requests for a lawyer were ignored and, therefore, her Fifth Amendment rights were violated. "The purpose of the Fifth Amendment right to counsel is to protect individuals from self-incrimination and assist in the custodial interrogation process." State v. Hoadley, 2002 SD 109, ¶26, 651 NW2d 249, 256 (citation omitted). "A person is not entitled to counsel if the interrogation is noncustodial." *Id.* Nevertheless, when counsel is requested, questioning must cease. State v. Hartley, 326 NW2d 226, 231 (SD 1982). "[A]n accused . . . having expressed [her] desire to deal with the police only through counsel, is not subject to further interrogation . . . until counsel has been made available to [her], unless the accused [her]self initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 US 477, 484-85, 101 SCt 1880, 1885, 68 LEd2d 378 (1981).

[¶28.]      In this case, at approximately 12:30 p.m., Wright asked Detective Olson, "Do I need to call a lawyer?" Detective Olson responded, "Like I said, I just want you to sit here and talk to me. I want to figure this out. You know if you didn't do anything wrong then you wouldn't need a lawyer. I want you to talk to me and tell me what happened." The interview then continued without Wright requesting an attorney. Wright does not argue that her 12:30 p.m. question was the type of ambiguous or equivocal request for counsel requiring Olson to clarify her question before continuing the interview. *See, e.g.*, State v. Blackburn, 2009 SD

37, ___ NW2d ___.[5]  Instead, Wright argues that her question, "Do I need to call a lawyer," was a request for a lawyer "as clear and unequivocal as [it] could be[,]" triggering *Edwards*.  (Appellant's Br. 28)  The State responds that Wright's question was not a clear and unequivocal request for counsel requiring the cessation of further questioning.

[¶29.]      The virtually identical question, asked by suspects in the closely related context of a custodial interrogations, is uniformly considered to be an equivocal request for counsel not triggering *Edwards*.  *See* Davis v. United States, 512 US 452, 459, 114 SCt 2350, 2355, 129 LEd2d 362 (1994) (concluding that an hour-and-one-half after reading Davis his *Miranda* rights, the statement, "Maybe I should talk to a lawyer," was an equivocal request for counsel).  *See also* Noyakuk v. State, 127 P3d 856, 871 (AlaskaCtApp 2006) (concluding that "Shouldn't I just have my attorney with me, or something?" was an equivocal request); State v. Radcliffe, 164 Wash2d 900, 907-08, 194 P3d 250, 254 (2008) (concluding that the defendant's statement, "maybe [I] should contact an attorney," was equivocal).  The law appears to be settled that this type of question is not an unequivocal request for counsel.

[¶30.]      Were there any doubt, Wright's 12:54 p.m. statement confirmed that factually, although she understood she had a right to counsel, her 12:30 p.m. question was not a *request* for counsel.  The recording of the interview reflects that

---

5.      *See also* United States v. Rodriguez, 518 F3d 1072, 1078-79 (9thCir 2008); Nom v. Spencer, 337 F3d 112, 118 (1stCir 2003); State v. Collins, 937 So2d 86, 92 (AlaCrimApp 2005); Freeman v. State, 857 A2d 557, 572-73 (MdCtSpecApp 2004); State v. Tuttle, 2002 SD 94, ¶14, 650 NW2d 20, 28; State v. Leyva, 951 P2d 738, 743 (Utah 1997).

following Wright's 12:30 p.m. question, Officer Olson began to repeat questions suggesting that Wright actually knew what happened. Wright became irritated with Officer Olson and interjected, "OK. That's fine. I need to call an attorney then." This spontaneous and unequivocal demand in response to Officer Olson's accusations confirms that Wright knew how to express an unequivocal request for a lawyer.

[¶31.] Finally, even if Wright's question had been an unequivocal request for counsel, Wright has not demonstrated that she was prejudiced by any statement elicited after her question. Ten of the twenty-four minutes at issue involved a break in the questioning. And, Wright has not briefed or identified at oral argument one incriminatory statement or one new inconsistent statement that was elicited during the remaining fourteen minutes.[6] For all of the foregoing reasons, we affirm the circuit court's conclusion that Wright was not deprived of her Fifth Amendment rights through any failure to honor a request for counsel.[7]

---

6. To the extent that Wright's statements after 12:30 p.m. may have been inconsistent, Wright has not demonstrated prejudice as she has not demonstrated how any alleged inconsistencies were materially different than those previously disclosed. The only statement of consequence Wright provided from 12:30 p.m. until 12:54 p.m., was that she volunteered to have her vehicle searched. However, her vehicle was not searched pursuant to this statement. Her vehicle was searched pursuant to a search warrant.

7. We acknowledge Wright's arguments that after 12:54 p.m. she also requested the use of a T.T.Y. to contact counsel, that she was told a T.T.Y. was unavailable, and that she made several written requests for an attorney. Wright, however, fails to acknowledge that her requests for a T.T.Y. and her written requests for counsel occurred after 12:54 p.m., when all questioning had ceased. Similarly, we acknowledge Wright's argument that an attorney from the public defender's office arrived around 4:50 p.m., and Wright was not permitted to consult with an attorney until 6:10 p.m. Again, however,

(continued . . .)

*C. Whether Wright's Statements Were Voluntary.*

[¶32.] Wright claims that Detective Olson was coercive, and that under the totality of the circumstances, especially considering her hearing disability, her statements to Detective Olson were involuntary. "When examining the voluntariness of a confession, [this Court] consider[s] the totality of the circumstances, giving deference to the trial court's factual findings, but performing a de novo review of the record, and making 'an independent determination of the ultimate issue of voluntariness.'" State v. Carothers, 2006 SD 100, ¶23, 724 NW2d 610, 619 (quoting State v. Tofani, 2006 SD 63, ¶30, 719 NW2d 391, 399). "Ultimately, '[t]he voluntariness of a confession depends on the absence of police overreaching. . . . Confessions are not deemed voluntary if, in light of the totality of the circumstances, law enforcement officers have overborne the defendant's will.'" State v. Cottier, 2008 SD 79, ¶19, 755 NW2d 120, 128 (internal citations omitted) (quoting *Tuttle*, 2002 SD 94, ¶20, 650 NW2d at 30). "The State must establish the voluntariness of a confessant's admission by a preponderance of the evidence." *Id.* (citing *Tuttle*, 2002 SD 94, ¶21, 650 NW2d at 30).

[¶33.] In analyzing this issue, courts look to the questioning officer's conduct in creating pressure and the suspect's capacity to resist the pressure. We look to:

> (1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure. On the latter factor, we examine such concerns as the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length

_____

(. . . continued)
Wright does not contend that any questioning took place during this period of time.

of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, [d]eception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect.

*Id.* ¶19, 755 NW2d at 129 (citing *Tuttle,* 2002 SD 94, ¶22, 650 NW2d at 31).

[¶34.]    In denying Wright's motion to suppress, the circuit court examined these factors and made a number of findings of fact supporting its conclusion that Wright's statements were voluntary. The circuit court found:

> 15. That Detective Olson was not abusive, overly coercive or overly pressuring during the interview with [Wright].
>
> 16. That [Wright] had the capacity to resist the pressure as demonstrated by her constant denial of knowledge of the disappearance of Darlene VanderGiesen and her continued profession of innocence.
>
> 17. That at the time of the interview, [Wright] made no confession or admission.
>
> 18. That [Wright] was inconsistent in her statements, but they were not involuntary.
>
> 19. That at the time of the interview, [Wright] was 42 years old, had achieved a tenth grade education and had an IQ of 114-117.
>
> 20. That the duration of the interview was 10:53 a.m. until 12:54 p.m., with breaks, although [Wright] was not allowed to walk around the [LEC].
>
> 22. That [Wright's] will was not overborne, but was strong.
>
> 27. That during the course of the interview, Detective Olson was not untruthful nor demeaning toward [Wright].

In addition to these findings, the taped interview reveals that Wright asked for and received cigarette and bathroom breaks. Ultimately, the circuit court found that

"[Wright's] will was not overborne, and she freely and voluntarily answered the Detective's questions."

[¶35.] Our review of the taped interview supports the circuit court's findings. The tape reflects that the interview was not conducted in a coercive atmosphere. Rather, the interview would be better described as conversational in character. Wright answered questions, corrected Detective Olson's statements, and even offered to have her vehicle searched. As the circuit court found, Wright had the capacity to resist the pressure through the constant denial of any knowledge of VanderGiesen's disappearance. The record demonstrates that Wright's will was not overborne. Considering the totality of the circumstances, and giving deference to the circuit court's underlying factual findings, the circuit court did not err in concluding that Wright's statements were voluntary.

### 2. Wright's Request for Consecutive Interpretation and a CDI.

[¶36.] Notwithstanding the circuit court's employment of extensive accommodations for Wright's hearing impairment, Wright claims a violation of her constitutional rights because the circuit court denied her request for consecutive interpretation and the appointment of a CDI during the trial. The Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and South Dakota Constitution, article VI, sections 2, 6, and 7 provide the rights to confront witnesses, to be present at trial and assist in the defense, and to understand the nature and cause of the charges. It is the trial judge's task to ensure that a hearing-impaired defendant is provided these rights. Linton v. State (*Linton II*), 275 SW3d 493, 500 (TexCrimApp 2009) (citing Ferrell v. Estelle, 568 F2d 1128, 1132 (5thCir 1978)),

*opinion withdrawn on appellant's death,* 573 F2d 867 (5thCir 1978). Further, a South Dakota statute requires that "[a] qualified interpreter shall be appointed . . . [i]n any court proceedings involving a person who is deaf . . . and such proceeding may result in the confinement of such person or the imposition of a penal sanction against such person[.]" SDCL 19-3-10.

[¶37.] Courts "apply an abuse of discretion standard in reviewing whether the trial court took adequate steps to ensure that a deaf defendant sufficiently understands the proceedings to be able to assist in [her] own defense." *Linton II,* 275 SW3d at 502. "The ultimate question is whether any inadequacy in the interpretation made the trial 'fundamentally unfair.'" *Id.* at 503 (quoting United States v. Huang, 960 F2d 1128, 1136 (2dCir 1992)).

[¶38.] A substantial portion of Wright's argument is based on expert testimony suggesting the best possible accommodations. That testimony, however, noted that large segments of the hearing population also have difficulties understanding legal terminology in legal proceedings. Further, communication accommodations are subject to practical, reasonable, and pragmatic limitations:

> The Constitution does not . . . guarantee every defendant a perfect trial. The rights vouchsafed are practical, reasonable rights rather than ideal concepts of communication, and even these pragmatic rights may not be exercised without limit. The Constitution does not require that every defendant comprehend the English language with the precision of a Rhodes Scholar or appreciate the nuances of a witness' expressions or behavior with the skill of a doctor of psychology. Nor may a defendant press the exercise of his right to the point at which he disrupts the public's right to an orderly trial.

*Ferrell,* 568 F2d at 1131.

[¶39.] This is not to suggest that expert opinion regarding necessary accommodations may be ignored. However, as noted in *Linton II*, a circuit court is provided wide discretion regarding interpretive services: "Because the proper handling of translation hinges on a variety of factors, including the defendant's knowledge of English *and the complexity of the proceedings and testimony, the trial judge, who is in direct contact with the defendant,* must be given wide discretion." 275 SW3d at 502-03 (emphasis added) (quoting Valladares v. United States, 871 F2d 1564, 1566 (11thCir 1989)). Thus, "[t]he choice of procedure to help a hearing-impaired defendant rests in the sound discretion of the trial court." State v. Johnson, 258 Kan 61, 68, 899 P2d 1050, 1056 (1995). *See also* People *ex rel.* Myers v. Briggs, 46 Ill2d 281, 287, 263 NE2d 109, 113 (1970) (concluding that if the defendant "is deaf, such opportunity as may be necessary should be allowed for communication to [her] of the testimony of the witnesses to [e]nsure [her] a full and fair exercise of [her] legal rights. The exact manner in which this result should be arrived at must depend on the circumstances of the case and, to a considerable extent, be left to the sound discretion of the court"). Ultimately, "*[t]he trial judge, on the scene and observing the defendant and the witnesses,* must be allowed considerable discretion, and where it is apparent that the judge has demonstrated an awareness of the issues involved and concern for the protection of the rights of the defendant, as here, his judgment must be accorded great weight and respect by this Court." Shook v. State, 552 So2d 841, 845 (Miss 1989) (emphasis added).

[¶40.] In the end, the question "is whether any inadequacy in the interpretation made the trial 'fundamentally unfair.'" *Linton II*, 275 SW3d at 503

(citation omitted). "[A] defendant in a criminal proceeding is denied due process when: (1) what is told [her] is incomprehensible; (2) the accuracy and scope of a translation at a hearing or trial is subject to grave doubt; (3) the nature of the proceeding is not explained . . . in a manner designed to [e]nsure . . . full comprehension; or (4) a credible claim of incapacity to understand due to language difficulty is made and the . . . court fails to review the evidence and make appropriate findings of fact." United States v. Cirrincione, 780 F2d 620, 634 (7thCir 1985).

[¶41.]    Wright was not denied due process under these standards. The circuit court clearly understood and appreciated the severity of Wright's communication difficulties. The court held two pre-trial hearings and considered the expert testimony regarding accommodations. At the conclusion of the first hearing, the court found that Wright was:

> [A]ble to participate in these proceedings in the sense that she can communicate with her attorneys. She would be able to communicate if she wished to testify through the ASL interpreters; that she is very competent or has great or good command – as Dr. Vernon says – of ASL. She's able to tell a story. Now she may struggle with legal concepts, which this [c]ourt does not find to be a standard of competency in this matter, because there are many people who come into this court that struggle with legal concepts. And what the Americans with Disabilities Act requires is that we make reasonable accommodations for those folks who have difficulties communicating or somehow participating in the proceedings; but that they are still subject to the same test of competency . . . . The [c]ourt is using reasonable efforts, making reasonable accommodations to allow Ms. Wright to communicate with her attorneys, for them to communicate with her, to maintain confidentiality of those communications, to use technology in assisting her in participating in these proceedings if their attention is diverted from the ASL [interpreters] . . . .

-21-

At the second hearing the circuit court again found that due to Wright's level of intelligence, her fluency in ASL, the real time captioning, the interpreters that would be provided (including a CDI before trial), the daily DVDs, and breaks during trial, it was providing meaningful accommodations to ensure comprehension.

A. *Consecutive Interpretation.*

[¶42.]     Notwithstanding the circuit court's sensitivity to Wright's needs and the court's accommodations designed to ensure Wright's comprehension of the proceedings, Wright argues that the failure to provide consecutive interpretation during the trial denied her "an equal right to be meaningfully present." (Appellant's Br. 46) Wright points out that it takes more time to express in sign language what is said orally, resulting in potential interpreter errors in simultaneous interpretation. Wright also points out that during the trial there were complex words for which there were no ASL signs, which then had to be finger-spelled. However, despite possessing DVDs of the entire trial, Wright fails to identify one misunderstanding, one interpreter error,[8] or one complex legal word causing a miscommunication or misunderstanding during trial. Further, she fails to acknowledge the court's use of real time reporting and opportunity for breaks, which would have given her the opportunity to obtain clarification if she had any uncertainties. Instead, Wright argues that her conviction must be set aside simply because of *potential* errors.

---

8.    Although Wright argues that at a pre-trial motions hearing the interpreter did not interpret "prelinguially deaf," but "born deaf," she does not contend that this occurred at trial or that it affected her ability to understand and participate in the trial proceedings.

[¶43.] In keeping with the notion that the question on appeal is whether Wright received due process rather than a "perfect" trial, it is significant that Wright has failed to identify any specific instances in which she may have misunderstood trial proceedings or was unable to communicate with her counsel. Further, Wright has not demonstrated: that anything she was told was incomprehensible; that the accuracy and scope of interpretation provided was subject to grave doubt; that the court did not describe the nature of the proceedings to her full comprehension; or that there was a credible claim of incapacity to understand the proceedings and the circuit court failed to review that evidence and make appropriate findings. *See Cirrincione,* 780 F2d at 634, *supra* ¶40. Wright, therefore, failed to demonstrate that the circuit court abused its discretion in providing alternative accommodations in response to her request for consecutive interpretation.

### B. Whether Wright Was Entitled to a CDI.

[¶44.] Wright also claims entitlement to a certified deaf interpreter (CDI) based on *Linton v. State (Linton I),* 246 SW3d 698 (TexCtApp 2007), which concluded that a deaf-relay interpreter (a CDI)[9] was constitutionally required. Linton argued that the trial court erred in not providing a deaf-relay interpreter to ensure her full understanding of the trial proceedings. Like Wright, Linton contended that the interpretation provided did not account for her low level

---

9. At oral argument, Wright's counsel indicated that a deaf-relay interpreter is another name for a CDI. *See also Linton II*, 275 SW3d at 510 (Johnson, J., concurring), *supra* ¶11 note 2.

comprehension of the English language, and that she was unable to understand or have a command of the interpreted language presented to her. The Texas intermediate appellate court agreed, concluding, "[W]e find that the appointment of an additional interpreter to break down concepts during breaks in trial was insufficient to provide Linton with a thorough understanding of the proceedings against her." *Id.* at 704. The court continued: "Moreover, given that the English based transliteration[10] did not account for Linton's low level comprehension of the English language, we find that the transliteration provided was also inadequate." *Id.*

[¶45.]     *Linton I*, however, was overruled by the Texas Criminal Court of Appeals:

> Although the [intermediate appellate court] may be right that a deaf-relay interpreter could have been "the best" solution to appellant's lack of hearing, it erred in concluding that the three

---

10.     LaVigne and Vernon explained transliteration:

> The role of the interpreter for the deaf is probably easiest to understand if we begin at the English end of the spectrum. The most English form of interpretation is known as transliteration. Transliteration is the means by which spoken English is converted word for word into visual English. . . .
>
> Transliteration conveys the words being spoken. It does not decode the spoken English–that is, it does not get to the meaning. Rather, it recodes the English, making the spoken word visible, either in signed form or orally. Oral transliteration is a type of interpretation in which the interpreter repeats the words of the speaker verbatim. Signed transliteration utilizes manually coded English and reproduces the words via hand signs and finger-spelling.

> Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process,* 2003 WiscLRev 843, 870-71 (2003).

> interpreters that the trial judge did use were constitutionally insufficient to ensure her due process rights.

*Linton II,* 275 SW3d at 509. The Texas Criminal Court of Appeals explained, "'the best' is not constitutionally required unless the defendant also shows that, without it, [s]he was unable to understand the nature and objective of the proceedings against h[er] and to assist in h[er] own defense." *Id.* at 508. In finding that the defendant failed to make that showing, the *Linton II* court highlighted the importance of demonstrating the inability to understand crucial testimony or the inability to adequately communicate with counsel during trial:

> [T]he record reflects that appellant understood the proceedings well enough to assist in her own defense; moreover, whatever communication difficulties *might* have existed between appellant and her trial counsel *were not apparent in the record.* The record reflects that the defense thoroughly and competently challenged every aspect of the State's case. *Appellant failed to set out, at the motion for new trial hearing, any specific instances* in which (1) she failed to understand crucial testimony during the trial, or (2) she was not able to communicate adequately with her counsel during the trial or how either of those failures led to a fundamentally unfair trial and a violation of her due-process rights.

*Id.* at 509 (emphasis added).

[¶46.] Like the defendant in *Linton II*, Wright provides no "concrete examples of how [she] failed to participate in her defense because of her linguistic incompetence," *see id.* at 499, and nothing in the record demonstrates that the lack of a CDI during the trial proceedings rendered Wright's trial fundamentally unfair. For these reasons and those expressed *supra* ¶43, we conclude the circuit court did not abuse its discretion in denying Wright's motion for a CDI during the courtroom proceedings.

### 3. The Circuit Court's System of Selecting Jurors.

[¶47.] Wright moved for a mistrial, arguing that the jury pool did not represent a cross-section of the community. "The Sixth Amendment to the United States Constitution guarantees that a petit jury will be selected from a panel of names representing a fair cross section of the community." St. Cloud v. Class, 1996 SD 64, ¶9, 550 NW2d 70, 73. Further, "[i]t is the policy of the State of South Dakota that all litigants in the courts of this state entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross-section of the community[.]" SDCL 16-13-10.1.

[¶48.] Wright had "the burden of making a prima facie showing that the cross-section requirement [was] violated." *St. Cloud*, 1996 SD 64, ¶10, 550 NW2d at 73. In order to establish a prima facie challenge:

> [T]he defendant must show that: (1) the group excluded is a "distinct" group in the community; (2) the representation of this group in the jury pool is not fair and reasonable in relation to the number of such persons in the community; (3) this under representation is due to the systematic exclusion of the group from the jury-selection process.

Primeaux v. Dooley, 2008 SD 22, ¶12, 747 NW2d 137, 141 (citations omitted).

[¶49.] Regarding the first prong, the State concedes and the circuit court found that African Americans are a distinct group. Regarding the second prong, the circuit court determined that Wright met her burden of showing that African Americans were not fairly represented.[11] Although the State argues that the circuit

---

11. In making this determination, the circuit court noted that out of approximately 800 juror questionnaires, 350 people responded. Of those, 164 were voir dired. While there is nothing in the record to show the racial

(continued . . .)

court erred in this second determination, we need not consider the argument as Wright failed to make a prima facie case of systematic exclusion. The circuit court found:

> I would agree with the numbers . . . that it would not appear that the group is fairly represented in the current jury pool that we have seen[.] However, I have heard the argument of counsel regarding its reasons why it believes that maybe some of these folks have been excluded . . . but the court does not find that the underrepresentation is due to a systematic exclusion of a group from the jury selection process.

[¶50.] Under SDCL 16-13-4.1, prospective jurors are selected from voter registration and driver's license lists. Wright argues that because some people's driver's licenses are revoked, persons of "lower economic status" are systematically excluded from the jury pool. (Appellant's Br. 62) Wright, however, did not provide any evidence of a relationship between the revocation of a driver's license and economic status or race. Furthermore, Wright provided no statistics regarding voter registrations of African Americans and how the use of the driver's license list, supplemented with voter registrations, affected the jury pool. Therefore, she provided no evidence to support her claim that African Americans were systematically excluded from the jury pool.[12]

_____

(. . . continued)

makeup of those 164 individuals, Wright stated to the circuit court that, in terms of minority representation generally, only two were Native American and the State responded that they thought two or three were African American. The circuit court referred to a 2005 United States Census reflecting that African Americans comprised 2% of the population of Minnehaha County.

12. Although Wright also argues that the jury *panels* did not include a fair representation of the community, that argument is misplaced.

(continued . . .)

[¶51.]       We have previously noted that numbers alone are insufficient proof of systematic exclusion, *St. Cloud,* 1996 SD 64, ¶25, 550 NW2d at 77, and the Court "will not presume that the source for jury selection fails to provide a fair cross-section of the community, absent adequate proof." State v. Arguello, 502 NW2d 548, 553 (SD 1993) (quoting State v. Lohnes, 432 NW2d 77, 84 (SD 1988)). Here, Wright failed to make any showing that African American exclusion occurred or that if it did, it was "inherent in the particular jury-selection process utilized." *St. Cloud,* 1996 SD 64, ¶24, 550 NW2d at 76 (quoting United States v. Garcia, 991 F2d 489, 491 (8thCir 1993)).

### 4. *Prior Altercation Involving Wright, VanderGiesen, and Collins.*

[¶52.]       Wright argues that the circuit court erred in admitting evidence of an altercation that occurred five days prior to VanderGiesen's disappearance. The altercation occurred when VanderGiesen was visiting Collins at Collins's apartment. Wright arrived unexpectedly, and Collins testified that when Wright

_____

(. . . continued)

> The composition of the panels . . . is irrelevant. A panel is selected *at random* from the master jury list, *see* SDCL 16-13-27, which is a "list of names randomly selected by the board of jury selectors from the jury selection lists[.]" SDCL 16-13-9.1. Because the master jury list is selected *at random* from the current precinct registration list (jury selection list), *see* SDCL 16-13-4.1, it may not accurately indicate the percentage of [African Americans] registered to vote. Theoretically, a panel could be composed entirely of women, men, blacks, whites, American Indians, or any combination. [Defendant] has failed to show that the process was not random or that it was due to the systematic exclusion of the group from the jury-selection process.

State v. Arguello, 502 NW2d 548, 553-54 (SD 1993).

saw VanderGiesen, Wright "got very mad and said, 'Why are you destroying our relationship?'" Collins asked Wright to leave, but Wright refused and Collins then suggested that VanderGiesen leave. As she was leaving, VanderGiesen "gave Wright the middle finger." Wright then started walking towards VanderGiesen, but Collins intervened by grabbing Wright. After VanderGiesen left, Collins and Wright argued about Collins's relationship with VanderGiesen. Collins subsequently asked Wright to leave, but Wright refused. Collins then tried to leave, but Wright blocked her at the door. Eventually, Collins was able to leave and call the police. When the police arrived, Wright agreed to leave. On her way out, Wright threatened Collins that she would be "very sorry."

[¶53.]        Prior to trial, the State moved to offer evidence of this altercation, arguing that it was *res gestae* and admissible other acts evidence. The State noted that the argument occurred five days after Wright started sending the threatening e-mails to VanderGiesen, and four days after Wright's e-mail to VanderGiesen stating, "am very disappointment [sic] in you because you always visit Collins when am [sic] not there, enough please, thanks[.]" The State argued that the altercation was blended with and explained the circumstances of the crime in that the failure of the e-mail threats led to the altercation, and that only five days later Wright set up the ruse meeting at the Pizza Hut after which VanderGiesen was killed. The State also argued that the altercation was evidence proving motive for the murder.

[¶54.]        Wright objected arguing that the evidence was not *res gestae* and did not fall under any exception in SDCL 19-12-5 (Rule 404(b)) (allowing other acts evidence when relevant to prove non-character matters such as motive, opportunity,

intent, preparation, plan, or knowledge). Wright also argued that the evidence was substantially more prejudicial than probative. *See* SDCL 19-12-3 (Rule 403). The circuit court allowed the evidence both as *res gestae* and under SDCL 19-12-5 (Rule 404(b)). "Evidentiary decisions of a trial court are presumed correct." State v. Owen, 2007 SD 21, ¶9, 729 NW2d 356, 362 (citation omitted). This Court reviews evidentiary decisions under the abuse of discretion standard. *Id*.

[¶55.] Other acts evidence is admissible under SDCL 19-12-5 (Rule 404(b)) when it is relevant for some purpose other than character. In applying the rule:

> The trial court must employ a two-step process when determining if prior bad acts should be admissible. First, the offered evidence must be relevant to a material issue in the case. Second, the trial court must determine "[w]hether the probative value of the evidence is substantially outweighed by its prejudicial effect."

*Id*. ¶14, 729 NW2d at 362-63 (internal citations omitted). "The res gestae rule is [also a] well-recognized exception to Rule 404(b)." State v. Goodroad, 1997 SD 46, ¶10, 563 NW2d 126, 130 (citation omitted). The *res gestae* exception permits the admission of evidence that is "so blended or connected" in that it "explains the circumstances; or tends logically to prove any element of the crime charged." *Owen*, 2007 SD 21, ¶15, 729 NW2d at 363 (citation omitted). Evidence, when a part of the *res gestae,* is proper if it is related to and tends to prove the crime charged although it also proves or tends to prove the defendant guilty of another crime. *Goodroad*, 1997 SD 46, ¶10, 563 NW2d at 130 (citations omitted).

[¶56.]        In its letter opinion, the circuit court applied the *res gestae* exception

and followed the SDCL 19-12-5 (Rule 404(b)) two-step analysis,[13] concluding:

> 1.  Rule 40[4](b) – An argument between a victim of a crime
>     and the person suspected of perpetrating the crime is
>     undoubtedly relevant as either motive or, more generally,
>     the suspect's feelings toward the victim.  The prejudice does
>     not outweigh the probative value.
>
> 2.  *Res Gestae* – The argument is admissible under the *res gestae*
>     standard.  The argument may explain the circumstance of
>     the death of the victim.

[¶57.]        "[I]n view of the law and the circumstances," this Court "could have

reasonably reached the same conclusion." *Hoadley*, 2002 SD 109, ¶17, 651 NW2d at

254 (quoting *Goodroad*, 1997 SD 46, ¶9, 563 NW2d at 129).  This altercation, just

days before VanderGiesen's disappearance, tended to prove the State's theory

regarding motive.  Considering the short time between the altercation and

VanderGiesen's death, it was also evidence tending to explain the events and

circumstances leading up to VanderGiesen's death.  The circuit court did not abuse

its discretion in admitting evidence of the prior altercation.

### 5.  *Sufficiency of the Evidence.*

[¶58.]        Wright argues that there was insufficient evidence to support the

jury's verdict of kidnapping, and therefore, there was insufficient evidence to

support the jury's verdict of felony murder.  Wright notes that there was no

---

13.    This Court has stated that the 404(b) "balancing must be conducted on the
       record." *Owen,* 2007 SD 21, ¶14, 729 NW2d at 363.  In this case, the circuit
       court did not conduct a contemporaneous balancing test on the record.  The
       court did, however, issue a letter opinion on the issue examining whether the
       altercation was admissible under SDCL 19-12-5 (Rule 404(b)) and/or the *res
       gestae* exception.

evidence of a struggle and no evidence that she and VanderGiesen left together in Wright's car. Wright further argues that there was insufficient evidence of the premeditation necessary for first degree murder. Wright specifically contends that there was no evidence of any murder weapon, a plan to kill VanderGiesen, or an explanation how VanderGiesen received her head injuries. Without knowing what caused those injuries, Wright argues, the jury could not have known whether there was premeditation. Because the same facts and inferences of fact tend to prove a plan to kidnap and a plan to murder VanderGiesen, we consider the sufficiency of the evidence supporting the offenses together.

[¶59.] In reviewing the sufficiency of the evidence, this Court considers "whether there is sufficient evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt; in making this determination, the Court will accept the evidence, and the most favorable inference fairly drawn therefrom, which will support the verdict." *Owen*, 2007 SD 21, ¶35, 729 NW2d at 367 (quoting State v. Mesa, 2004 SD 68, ¶9, 681 NW2d 84, 87). Further, "this Court will not resolve conflicts in the evidence, pass on the credibility of witnesses, or weigh the evidence." State v. Frazier, 2002 SD 66, ¶8, 646 NW2d 744, 748 (quoting State v. Buchholz, 1999 SD 110, ¶33, 598 NW2d 899, 905).

[¶60.] "Homicide is murder in the first degree . . . [i]f perpetrated . . . with a premeditated design to effect the death of the person killed[.]" SDCL 22-16-4(1).

> The term, premeditated design to effect the death, means an intention, purpose, or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed. A premeditated design to effect death

sufficient to constitute murder may be formed instantly before committing the act.

SDCL 22-16-5. "When determining if premeditation exists[,] we consider the following factors:  1) the use of a lethal weapon; 2) the manner and nature of the killing; 3) the defendant's actions before and after the murder; and 4) whether there was provocation."  *Owen*, 2007 SD 21, ¶36, 729 NW2d at 367 (citation omitted). "However, direct proof of deliberation and premeditation is not necessary.  It may be inferred from the circumstances of the killing."  State v. Owens, 2002 SD 42, ¶96, 643 NW2d 735, 757 (citation omitted).

[¶61.]        The felony murder statute, SDCL 22-16-4(2), provides in relevant part that "[h]omicide is murder in the first degree . . . [i]f committed by a person engaged in the perpetration of, or attempt to perpetrate . . . kidnapping[.]"  At the time Wright was charged, the kidnapping statute provided in relevant part:

> Any person who shall seize, confine, inveigle, decoy, abduct[,] or carry away any person and hold or detain such person . . . [t]o inflict bodily injury on or to terrorize the victim or another . . . is guilty of kidnapping.

SDCL 22-19-1 (1993).  "Inveigle means '[t]o lure or entice or lead astray, by false representations or promises, or other deceitful means.'"  State v. Running Bird, 2002 SD 86, ¶25 n3, 649 NW2d 609, 614 n3 (citation omitted).

[¶62.]        The circumstantial evidence reflects that prior to VanderGiesen's disappearance, Wright was jealous of VanderGiesen because of her relationship with Collins.  The evidence further reflects that following Wright's unsuccessful attempts to terminate that relationship, Wright lured VanderGiesen into the ruse meeting at the Pizza Hut.  On the day of that meeting VanderGiesen left work at

5:07 p.m., went home and changed clothes, and then drove to the Pizza Hut to meet Wright. Following the meeting, VanderGiesen disappeared and her car was left abandoned at the restaurant. During her interview regarding the meeting, Wright lied several times when Detective Olson asked her about the event. From this, the jury could have inferred that VanderGiesen was "inveigled" and "decoyed" into meeting Wright at that location. *See id.* ¶25, 649 NW2d at 614 (stating, "[a]lthough we acknowledge that [the victim] voluntarily walked with [defendant] to the site of the rape, she was 'inveigled' and 'decoyed' into doing so").

[¶63.] The evidence is undisputed that after Wright and VanderGiesen met, VanderGiesen disappeared, was brutally murdered, and was dismembered. The evidence established that: VanderGiesen's car keys, house keys, wallet, and identification were missing following her trip to the Pizza Hut; that VanderGiesen's blood was found on the bumper of Wright's car; and that DNA from both VanderGiesen and Wright was found on VanderGiesen's American Sign Language sweatshirt in the landfill buried with VanderGiesen's body parts.

[¶64.] Additionally, Dr. Randall and Dr. Habbee confirmed that VanderGiesen died as the result of either blunt force head trauma or suffocation or both. While the weapon that caused the blunt force trauma was never found, the physical evidence indicated that VanderGiesen received at least two blows to the head with the object, leaving a seven-inch skull fracture. Dr. Randall testified that a plastic bag was also tied around VanderGiesen's neck constituting another "lethal environment" and that "no one can live for a period of time with a thick plastic bag

over their head." Considering the manner of death, the jury could have found that the repeated blows and suffocation were designed to inflict VanderGiesen's death.

[¶65.]     The jury also considered Wright's actions after VanderGiesen's death. "Attempts to conceal or dispose of evidence may . . . support an implicit finding of premeditation." *Owens*, 2002 SD 42, ¶97, 643 NW2d at 758 (citation omitted). The post-death evidence reflects that Wright made several attempts to conceal the crime. She first attempted to burn VanderGiesen's body. When that failed, Wright used a chainsaw to dismember VanderGiesen's body and discarded the remains at different locations. Wright also attempted to destroy evidence of the crime by cleaning her car and painting the basement where she dismembered VanderGiesen's body.

[¶66.]     Thus, considering Wright's jealousy and threats, the ruse meeting, VanderGiesen's disappearance following that meeting, the cause of death, the physical evidence tying Wright to the death, dismemberment and concealment of the body, there was sufficient evidence to suggest a premeditated plan to kidnap and kill VanderGiesen. Furthermore, because the evidence was sufficient to support the jury's verdict on the charge of kidnapping, the evidence was sufficient to support the jury's verdict on felony murder as the evidence suggests that VanderGiesen died during the course of the kidnapping.

*6. Convictions for Both Kidnapping and Felony Murder-Double Jeopardy.*

[¶67.]     The Double Jeopardy Clause of the United States Constitution's Fifth Amendment provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb[.]" US Const amend V. Similarly, South

Dakota's Constitution provides that "[n]o person shall . . . be twice put in jeopardy for the same offense." SD Const art VI, § 9. "These provisions shield criminal defendants from both multiple prosecutions and multiple punishments for the same criminal offense if the Legislature did not intend to authorize multiple punishments in the same prosecution." State v. Dillon, 2001 SD 97, ¶13, 632 NW2d 37, 43. Wright argues that because the convictions of kidnapping and felony murder arise out of the same incident, the multiple convictions[14] violate these provisions.

[¶68.] We decline to consider this argument because Wright failed to preserve it for appeal. Wright never asked the circuit court to rule on the issue, and the failure to raise an issue before the circuit court constitutes a waiver of the issue on appeal. Hoglund v. Dakota Fire Ins. Co., 2007 SD 123, ¶30, 742 NW2d 853, 861; State v. Henjum, 1996 SD 7, ¶13, 542 NW2d 760, 763. This includes a double jeopardy claim: "Even a fundamental right may be deemed waived if it is raised for the first time on appeal." *Dillon,* 2001 SD 97, ¶11, 632 NW2d at 43.

### 7. Cumulative Error.

[¶69.] Wright argues that the cumulative effect of the circuit court's errors denied her a fair trial. Because Wright has not established any prejudicial error, we conclude that she received a fair trial.

[¶70.] GILBERTSON, Chief Justice, and KONENKAMP and MEIERHENRY, Justices, and SABERS, Retired Justice, concur.

---

14. As previously noted, Wright did not receive multiple punishments as result of the felony murder conviction. The court did not impose a sentence for this conviction.